575 So.2d 181 (1991)
Clinton Lamar JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 71564.
Supreme Court of Florida.
January 18, 1991.
*184 Richard J. Sanders, Gulfport, for appellant.
Robert A. Butterworth, Atty. Gen., and Michele Taylor, Asst. Atty. Gen., Tampa, for appellee.
BARKETT, Justice.
In his first trial for armed robbery and first-degree murder, the appellant, Clinton Lamar Jackson ("Jackson"), was convicted and sentenced to death. This Court reversed the conviction, vacated the sentence, and remanded for a new trial. Jackson v. State, 498 So.2d 906 (Fla. 1986). On retrial, Jackson again was convicted and sentenced to death. We now review the convictions and sentence of death imposed at the conclusion of Jackson's second trial. We affirm the convictions but vacate the sentence of death and remand for imposition of a sentence of life imprisonment.[1]
Evidence adduced in the guilt phase of the trial showed that at about 5 p.m. on January 17, 1984, two customers entered the Davis Hardware Store in St. Petersburg, Florida. There they found the owner, Herbert Phillibert, fifty-three, lying facedown behind the counter, semiconscious, and clutching a five-dollar bill in one of his hands. The cash register drawer was open, containing only a one-dollar bill, and coins lay scattered about on the floor. The customers summoned emergency medical personnel, but Phillibert had already died by the time they arrived a few minutes later. Phillibert had been shot once in the *185 lower right chest from a distance of at least three feet. There were no witnesses to the shooting, and Phillibert was unable to describe what happened before he died.
Delores Flournoy and Elma Lindsay testified that during the late afternoon on the day of the killing, they saw two black males in their twenties running through an alley away from the direction of the store and jumping into a small black pickup truck. Flournoy and Lindsay could not identify the men, but they identified the truck as one belonging to Bennie Phillips, the boyfriend of Marsha Jackson. She is the mother of the appellant and his brother, Nathaniel Jackson.[2]
Over Jackson's objection, some of the evidence against Jackson was presented in the form of prior sworn testimony of Melvin Eugene Jones, who had testified at Jackson's first trial. Jones, a cabinetmaker, was in jail on numerous charges when he testified in Jackson's first trial. He testified that he saw Jackson in a black pickup truck at various times during the day of the incident, and that he saw Jackson's brother in the passenger's seat early that day. At about 4:45 p.m., Jones said, he saw Jackson driving the truck in the direction of the hardware store, and about a half hour later he saw Jackson driving the truck away from the direction of the store. Jones could not identify the passenger the last time he saw the truck that day.
Police found Jackson's fingerprint on the driver's side of the truck, and found his brother's fingerprints on the front and passenger side. Police also found his brother's palm print on the back of the cash register at Davis Hardware, but they did not find Jackson's prints anywhere in the store. After police arrested Jackson, he waived his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and denied any involvement in or knowledge of the shooting. He said he had been with his brother in the truck earlier in the day, but he dropped off his brother at 4 p.m. and did not see him again that afternoon.
Jones's prior testimony indicated that several days before the incident, he asked Jackson to buy some supplies at Davis Hardware. Jackson returned with the supplies and told Jones, "I'm going to knock your buddy over down at the store." Jones further testified that he had seen a handgun, perhaps .32-caliber, hidden under the front seat of that black pickup truck at some time before the shooting.
A test to search for gunpowder residue on Jackson's hands after his arrest proved inconclusive. The state recovered the bullet from Phillibert's body but offered no testimony to describe its caliber or source. The murder weapon was never identified or recovered.
After Jackson's arrest, his mother and her boyfriend visited him in jail. Inmate Freddie Williams, who sat next to Jackson,[3] testified that he heard Jackson tell his mother, "we had to do it because he had bucked the jack." Williams testified that he understood "bucked the jack" to mean a robbery victim resisted the robbery, although "[j]ack refers to money ... and a lot of different things." Williams also said he heard Jackson tell his mother "to tell Nate, if they picked up Nate, to tell him that he hadn't  he hadn't been nowhere around the hardware store and get rid of the gun." Williams at the time had been in jail on numerous charges including violation of life parole. Williams said he expected no leniency, but he admitted pleading guilty to five pending felony charges after he informed on Jackson, and he was upset that he got eight years' imprisonment concurrent with the reinstatement of his life sentence. Williams also admitted that he has testified for the state about other jail-house conversations in four other cases.
*186 Jackson presented no evidence in the guilt phase, and the jury found him guilty of armed robbery and first-degree murder.

I. GUILT PHASE
Jackson contends that there is insufficient evidence to support premeditated murder, and that the evidence also fails to support felony murder because the state did not prove armed robbery, the predicate offense for the charge of felony murder.
We agree that the evidence did not establish premeditated murder. Premeditation, as an element of first-degree murder,
is a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues. Weaver v. State, 220 So.2d 53 (Fla. 2d DCA), cert. denied, 225 So.2d 913 ([Fla.] 1969). Premeditation does not have to be contemplated for any particular period of time before the act, and may occur a moment before the act. Hernandez v. State, 273 So.2d 130 (Fla. 1st DCA)[,] cert. denied, 277 So.2d 287 ([Fla.] 1973). Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed and the nature and manner of the wounds inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it insofar as the life of the victim is concerned. Larry v. State, 104 So.2d 352 (Fla. 1958).
Sireci v. State, 399 So.2d 964, 967 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982). The state relies on Sireci and Griffin v. State, 474 So.2d 777, 780 (Fla. 1985), cert. denied, 474 U.S. 1094, 106 S.Ct. 869, 88 L.Ed.2d 908 (1986), to argue that the murder here was premeditated. However, that reliance is misplaced. In Sireci, premeditation was proved with evidence that the defendant clubbed the victim over the head with a wrench, then stabbed and cut the victim fifty-five times in the chest, head, back, and extremities, and finally slit his throat. In Griffin, premeditation was supported by evidence that Griffin used a "particularly lethal gun"; the bullets were of a special type designed to have "a high penetrating ability"; there was no sudden provocation caused by the victim; and Griffin fired two shots into his victim at close range. Griffin, 474 So.2d at 780. Those facts are completely distinguishable from the instant case where there is no evidence to indicate an anticipated killing, and where all of the evidence is equally and reasonably consistent with the theory that Phillibert resisted the robbery, inducing the gunman to fire a single shot reflexively, not from close range, with an unidentified type of weapon and bullet. There is no evidence of a fully-formed conscious purpose to kill. Moreover, there is no evidence in this record that Jackson fired the shot that killed Phillibert.
As to the felony-murder theory, Jackson argues that a trier of fact reasonably could infer that the threat of violence and the shooting occurred in the course of escape after the theft was completed; thus, no armed robbery was proved beyond a reasonable doubt. See Royal v. State, 490 So.2d 44 (Fla. 1986). Since there was no armed robbery, he argues, there could have been no felony murder predicated on an underlying armed robbery pursuant to section 782.04(1)(a)(2)(d) of the Florida Statutes (1983). We disagree. The evidence against Jackson was entirely circumstantial. The evidence of armed robbery on which the state relies is consistent with a finding of guilt beyond a reasonable doubt, and Jackson does not present any reasonable hypothesis of innocence when viewed in light of the totality of the evidence against him. See Cox v. State, 555 So.2d 352 (Fla. 1989); McArthur v. State, 351 So.2d 972 (Fla. 1977). It follows that the felony-murder theory also was supported by the evidence.
Jackson next argues that the trial court should have excluded Jones's prior sworn *187 testimony because the state did not make a diligent effort to locate him before offering that testimony as evidence. Alternatively, Jackson argues that he should have been granted a continuance to find Jones himself. We find no merit in these claims.
Section 90.804(1)(e) of the Florida Statutes (1983), provides that a witness may be declared unavailable if he "[i]s absent from the hearing, and the proponent of his statement has been unable to procure his attendance or testimony by process or other reasonable means." Under that statute,
[t]he burden of demonstrating the unavailability of a witness for trial rests on the party that seeks to use the missing witness's previous testimony. The responsibility for evaluating the adequacy of the showing of nonavailability rests with the trial judge, and his determination of this issue will not be disturbed unless an abuse of discretion clearly appears.
Outlaw v. State, 269 So.2d 403, 404 (Fla. 4th DCA 1972), cert. denied, 273 So.2d 80 (Fla. 1973); see also Stano v. State, 473 So.2d 1282, 1286 (Fla. 1985), cert. denied, 474 U.S. 1093, 106 S.Ct. 869, 88 L.Ed.2d 907 (1986).
Section 90.804(1)(e) required the state to exercise due diligence in making a good faith effort to locate Jones. Cf. Pope v. State, 441 So.2d 1073, 1076 (Fla. 1983) (party must exercise due diligence in searching for a missing witness before offering into evidence the witness's perpetuated deposition testimony pursuant to Florida Rule of Criminal Procedure 3.190(j)(6)). The record shows that the trial court fully and fairly reviewed the state's efforts, and we find no abuse of discretion. Likewise, we find no abuse of discretion in the trial court's refusal to grant Jackson a continuance. See, e.g., Acree v. State, 153 Fla. 561, 15 So.2d 262 (Fla. 1943).
We also find meritless Jackson's argument that the court should have instructed the jury to consider the lesser included offense of third-degree murder. Jackson requested various instructions at trial, but there is nothing in the record to show that he made the appropriate requests or objections relevant to a third-degree murder instruction. Thus, he did not preserve this issue for appeal. Even if the issue had been preserved, and if there had been evidence to support the instruction, "any error in failing to give it was harmless because the court did instruct the jury on second-degree murder which was only one step removed from the crime of which" Jackson was convicted. Perry v. State, 522 So.2d 817, 819-20 (Fla. 1988).
Although the aforementioned claims have no merit, we find merit in three other arguments alleging that: (1) a portion of Jones's prior testimony should have been excluded; (2) the jury should not have been allowed to draw inferences from the fact that Jackson's mother did not testify; and (3) the instruction on flight was unsupported.
First, Jackson argues that the trial court should not have admitted into evidence that portion of Jones's prior testimony in which he alleged that threats had been made against him. Jones testified that when he appeared outside the grand jury room, he heard Jackson's mother, sister, and his mother's boyfriend threaten to harm or kill him if he decided to testify. He said other unidentified people made similar threatening remarks when he was in jail on charges unrelated to the murder.
This issue is analogous to the one presented in State v. Price, 491 So.2d 536 (Fla. 1986). There, a state witness testified in direct examination that she had been threatened by a third party. We held that "[a] third person's attempt to influence a witness is inadmissible on the issue of the defendant's guilt unless the defendant has authorized the third party's action," and we barred the evidence because its probative value was "far outweighed by its prejudicial impact." Id. at 536-37; see § 90.403, Fla. Stat. (1983). In the instant case, there was no evidence that the threats against Jones had been authorized by Jackson. Moreover, the defense counsel did not open the door merely by asking Jones about whether the state had offered Jones any deals to testify. As we reasoned in Price, the evidence should not have been admitted. *188 However, we note that the trial court gave a cautionary instruction to limit the harm of the testimony against Jackson.
Second, Jackson correctly contends that the state should not have told the jury to draw inferences from the fact that Jackson did not call his mother to testify. It is well settled that due process requires the state to prove every element of a crime beyond a reasonable doubt, and that a defendant has no obligation to present witnesses. Accordingly, the state cannot comment on a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to believe that the defendant carried the burden of introducing evidence.[4] However, this Court has applied a narrow exception to allow comment when the defendant voluntarily assumes some burden of proof by asserting the defenses of alibi, self-defense, and defense of others, relying on facts that could be elicited only from a witness who is not equally available to the state. A witness is not equally available when there is a special relationship between the defendant and the witness. State v. Michaels, 454 So.2d 560, 562 (Fla. 1984); Buckrem v. State, 355 So.2d 111, 112 (Fla. 1978); see also Brown v. State, 524 So.2d 730, 731 (Fla. 4th DCA 1988); Romero v. State, 435 So.2d 318, 319 (Fla. 4th DCA 1983), review denied, 447 So.2d 888 (Fla. 1984); Jenkins v. State, 317 So.2d 90, 91 (Fla. 1st DCA 1975).
In Buckrem, the defendant asserted an alibi defense and claimed that at the time of the murder he was with his wife at a friend's house. The Court held that the state did not err in commenting on the defendant's failure to call two highly relevant alibi witnesses. See also Brown, 524 So.2d at 731 (reversible error found when the state  not the defendant  put alibi into issue, and then created the impression that alibi witnesses existed but were not called). The Court clarified the Buckrem analysis in Michaels. There, Michaels put into issue the defenses of self-defense and defense of others, but then failed to elicit the testimony of his daughter, who had been at the center of the dispute and was critical to the asserted theories of defense. The Court held that the comment was allowed since "[s]he was not `equally available' to the prosecution because of the parent-child relationship which would normally bias her toward supporting her father's defenses." Michaels, 454 So.2d at 562; see also Romero, 435 So.2d at 319 (family of defendant's girlfriend); Jenkins, 317 So.2d at 91 (defendant's common law wife).
In the instant case, Jackson put on no evidence in the guilt phase, nor did he put into issue any particular theory of defense to which his mother could have related relevant testimony. Jackson had no burden to present evidence, and he chose not to do so. Under those circumstances, the witness's special relationship to Jackson was irrelevant, and the trial court erred by allowing the state to bring the witness's absence into issue in its closing argument.
Finally, we find merit in Jackson's contention that the trial court should not have instructed the jury to infer consciousness of guilt from flight. As we said in Whitfield v. State, 452 So.2d 548, 549 (Fla. 1984), an instruction of flight is permissible only "where there is significantly more evidence against the defendant than flight standing alone." Where the only other evidence to tie the defendant to the crime is circumstantial, and the evidence of flight would be no more consistent with guilt than with innocence, the instruction is barred. Id. at 550; see also Rhodes v. State, 547 So.2d 1201, 1203 (Fla. 1989) (evidence that defendant was stopped for speeding after a murder had taken place was insufficient to support instruction that defendant was fleeing to avoid prosecution). Here, the only evidence of flight was that two unidentified men ran from the store, and a witness saw Jackson driving away from the general direction of the store, possibly in excess of the speed limit. Departure from the scene of a crime, albeit *189 hastily done, is not the flight to which the jury instruction refers. Otherwise, the instruction would be given every time a perpetrator left the scene, and it would be omitted only in those cases where the perpetrator waited for the police to arrive. The evidence in this case did not warrant an instruction of flight. See id.; Bundy v. State, 471 So.2d 9, 21 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); Whitfield, 452 So.2d at 549-50.
Having found error, we must determine whether the state has borne its burden of proving beyond a reasonable doubt that there is no reasonable possibility that error contributed to the conviction. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Because we find multiple errors, we must consider whether
even though there was competent substantial evidence to support a verdict ... and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors was such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation.
Seaboard Air Line R.R. Co. v. Ford, 92 So.2d 160, 165 (Fla. 1956) (on rehearing); see also, e.g., Alvord v. Dugger, 541 So.2d 598, 601 (Fla. 1989) (harmless error analysis reviewing the errors "both individually and collectively"), cert. denied, ___ U.S. ___, 110 S.Ct. 1834, 108 L.Ed.2d 963 (1990); Jackson v. State, 498 So.2d 906, 910 (Fla. 1986) ("the combined prejudicial effect of these errors effectively denied appellant his constitutionally guaranteed right to a fair trial").
First, none of the errors here were fundamental, nor did they go to the heart of the state's case since each was ancillary to the facts linking Jackson to the crime. Second, had these errors not been committed, the jury still would have heard evidence that Phillibert was robbed and shot to death; that Jackson previously indicated his intent to rob Phillibert's store; that Jackson was seen driving in the vicinity of the store shortly before and after the crime; that Jackson had been driving with his brother, whose fingerprints were found on the cash register; that Jackson said afterward "we had to do it because he had bucked the jack"; and that Jackson asked his mother to tell his brother to say "he hadn't been nowhere around the hardware store and get rid of the gun."
Considering the weight of the errors and the magnitude of the totality of the evidence against Jackson, we find there is no reasonable possibility that these three errors contributed to the conviction. There is sufficient competent evidence in the record to support the guilty verdicts as to armed robbery and felony murder.

II. PENALTY PHASE
In the penalty phase, Detective Kappel testified that after visiting Jackson in jail, Jackson's mother told the detective that Jackson admitted involvement in the crime, that Jackson told her "the guy bucked the jack," and that "she felt that Nathaniel was being held by the victim and her son Clinton had to shoot him to gain the release of her other son."[5] Jackson's mother testified and denied that she made these statements to Kappel; she said Jackson told her he did not do it. Jackson testified and denied involvement in the shooting. He said he was "very sorry" that Phillibert was dead; that he was twenty-one years old when Phillibert died; that as a ten-year-old, Jackson saved a six-year-old child from drowning; that he was a good father figure to his family when he was growing up in a fatherless home; and that he was a good father to his own two children.
The jury recommended death by a ten-to-two vote. The circuit court imposed the death sentence after finding two aggravating circumstances and no mitigating circumstances. The first aggravating circumstance merged three separate *190 statutory aggravating circumstances because each stemmed from a single criminal act: the murder was committed while Jackson was engaged in, or was an accomplice in, the crime of robbery; the murder was committed for financial gain; Jackson had been previously convicted of a violent felony (this robbery).[6] The second aggravating circumstance was that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.[7]
Jackson raises four points on appeal, two of which we address here.[8] First, Jackson contends that the trial court erred in finding that he killed Phillibert to avoid or prevent a lawful arrest or effect an escape from custody.
In applying this factor where the victim is not a law enforcement officer, we have required that there be strong proof of the defendant's motive, Riley v. State, 366 So.2d 19 (Fla. 1978), and that it be clearly shown that the dominant or only motive for the murder was the elimination of the[] witness. Bates v. State, 465 So.2d 490 (Fla. 1985); Oats v. State, 446 So.2d 90 (Fla. 1984). We have also held that the mere fact that the victim knew and could have identified his assailant is insufficient to prove intent to kill to avoid lawful arrest. Caruthers v. State, 465 So.2d 496 (Fla. 1985); Rembert v. State, 445 So.2d 337 (Fla. 1984); Riley.

Perry v. State, 522 So.2d 817, 820 (Fla. 1988). There is no evidence in this record that Jackson had any intent to kill Phillibert to prevent him from identifying Jackson. The mere fact that Jackson once before had been in the store fails to satisfy this aggravating circumstance beyond a reasonable doubt. See, e.g., id. The trial court erred in finding this aggravating circumstance.
Next, Jackson argues that the death penalty is unconstitutionally disproportional punishment as applied to this case under Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). We agree.
It is well settled that a fundamental requirement of the eighth amendment of the United States Constitution is that the death penalty must be proportional to the culpability of the defendant. In Enmund, the United States Supreme Court, "citing the weight of legislative and community opinion, found a broad societal consensus, with which it agreed, that the death penalty was disproportional to the crime of robbery-felony murder" under the circumstances of that case. Tison, 481 U.S. at 147, 107 S.Ct. at 1682; cf. Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding the death penalty disproportional to the crime of rape). Individualized culpability is key, and "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." Tison, 481 U.S. at 156, 107 S.Ct. at 1687. Hence, if the state has been unable to prove beyond a reasonable doubt that a defendant's mental state was sufficiently culpable to warrant the death penalty, death would be disproportional punishment. See generally id.; Enmund, 458 U.S. at 782, 102 S.Ct. at 3369.
In Enmund and Tison, the Court said that the death penalty is disproportional punishment for the crime of felony murder where the defendant was merely a minor participant in the crime and the state's evidence of mental state did not prove beyond a reasonable doubt that the *191 defendant actually killed, intended to kill, or attempted to kill. Mere participation in a robbery that resulted in murder is not enough culpability to warrant the death penalty, even if the defendant anticipated that lethal force might be used, because "the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen." Tison, 481 U.S. at 151, 107 S.Ct. at 1684. However, the death penalty may be proportional punishment if the evidence shows both that the defendant was a major participant in the crime, and that the defendant's state of mind amounted to reckless indifference to human life. As the Court said, "we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Tison, 481 U.S. at 158, 107 S.Ct. at 1688. Courts may consider a defendant's "major participation" in a crime as a factor in determining whether the culpable state of mind existed. However, such participation alone may not be enough to establish the requisite culpable state of mind. Id., 481 U.S. at 158 n. 12, 107 S.Ct. at 1688 n. 12.
Cases that best illustrate the application of the Enmund/Tison rule include Tison itself, and cases in which this Court has applied Tison. See, e.g., DuBoise v. State, 520 So.2d 260 (Fla. 1988) (on rehearing); Diaz v. State, 513 So.2d 1045 (Fla. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1022 (1988).
In Tison, the defendants were Ricky Wayne Tison and Raymond Curtis Tison, two sons of Gary Tison. Gary was a convicted killer serving a life term for killing a prison guard during an attempted escape. Ricky and Raymond, with others, planned and executed a prison break in which they approached the Arizona State Prison with an ice chest filled with guns. They armed their father's cellmate, also a convicted killer, and broke out of jail. When their car broke down in the desert, they flagged down a passing car. Inside the car were John and Donelda Lyons, their two-year-old son and their fifteen-year-old niece. John Lyons begged the assailants for their lives. But, with Ricky and Raymond present at the scene, Gary and his cellmate walked over to the captives and fired repeated shotgun blasts into them, killing all four. Then the Tisons drove away in the stolen car, continuing their flight until the police stopped them in a shoot-out at a roadblock several days later.
The Court focused on the following facts to determine Ricky and Raymond's culpability:
Raymond Tison brought an arsenal of lethal weapons into the Arizona State Prison which he then handed over to two convicted murderers, one of whom he knew had killed a prison guard in the course of a previous escape attempt. By his own admission he was prepared to kill in furtherance of the prison break. He performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed. He robbed these people at their direction and then guarded the victims at gunpoint while they considered what next to do. He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, he chose to assist the killers in their continuing criminal endeavors, ending in a gun battle with the police in the final showdown.
Ricky Tison's behavior differs in slight details only. Like Raymond, he intentionally brought the guns into the prison to arm the murderers. He could have foreseen that lethal force might be used, particularly since he knew that his father's previous escape attempt had resulted in murder. He, too, participated fully in the kidnaping and robbery and watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims.
Tison, 481 U.S. at 151-52, 107 S.Ct. at 1684-85. On those facts, the Court determined that both Ricky and Raymond "subjectively appreciated that their acts were likely to result in the taking of innocent life," and that their respective states of mind amounted to "reckless indifference to *192 the value of human life." Id., 481 U.S. at 152, 107 S.Ct. at 1685.
In Diaz, we affirmed the death sentence of one of three men accused in the murder of a bar manager during a holdup. There was evidence from a witness that Diaz himself had been the triggerman. Moreover, evidence showed that Diaz "and his fellow robbers each discharged a gun during the robbery. There is evidence that Diaz's gun had a silencer. Eight to twelve persons occupied the bar at the time of the robbery." Diaz, 513 So.2d at 1048. We concluded that Tison and Enmund were satisfied because the evidence proved beyond all reasonable doubt that "Diaz was a major participant in the felonies and at the very least was recklessly indifferent to human life." Id.
In DuBoise, we concluded that Tison and Enmund had been satisfied with proof that
DuBoise and his two companions decided to grab a woman's purse in order to get some money. As they passed the victim on the street, DuBoise left their car and attempted to snatch her purse. When she resisted, the other man came to assist DuBoise. The victim recognized one of DuBoise's companions, and the three men put the victim in the car and drove to another area of town. There, while DuBoise raped her, the man whom the victim had recognized struck her with a piece of lumber. DuBoise's companions then raped the woman and both struck her with pieces of lumber.
DuBoise was a major participant in the robbery and sexual battery. He made no effort to interfere with his companions' killing the victim. By his conduct during the entire episode, we find that he exhibited the reckless indifference to human life required by Tison.

DuBoise, 520 So.2d at 266.
The facts in Tison, Diaz, and DuBoise presented compelling evidence not only that each defendant actively participated in their respective crimes, but that each had a highly culpable state of mind. In Tison, the defendants armed known killers, one of whom had killed in the same situation once before. During a prolonged affair, they watched four murders, at least some of which they may have been able to stop, and then they continued on their criminal ways until the police stopped them in a shoot-out. One of the Tison brothers admitted that he was prepared to kill to get his father out of prison. In Diaz, the evidence proved that Diaz entered the bar possessing a gun equipped with a silencer, from which a reasonable inference can be drawn that he contemplated killing someone. Not only did he discharge the weapon with twelve innocent people in the bar, but a witness testified that Diaz was the actual killer. In DuBoise, the defendant kidnapped and robbed the woman, and then raped her while he watched his companions beat her to death. It was a long, drawnout episode, like the one in Tison, during which DuBoise had the chance to stop his companions from committing murder, but he chose not to do so.
Although the evidence against Jackson shows that he was a major participant in the crime, it does not show beyond every reasonable doubt that his state of mind was any more culpable than any other armed robber whose murder conviction rests solely upon the theory of felony murder. See Tison, 481 U.S. at 150-51, 107 S.Ct. at 1684-85. The entire case is based on circumstantial evidence. The totality of the record shows that Jackson previously indicated his intent to rob Phillibert's store; that Jackson was seen driving in the vicinity of the store shortly before and after the crime; that Jackson had been driving with his brother, whose fingerprints were found on the cash register; that Jackson said afterward "we had to do it because he had bucked the jack"; and that Jackson asked his mother to tell his brother to say "he hadn't been nowhere around the hardware store and get rid of the gun." A reasonable inference could be drawn from the evidence in this record that either of the two robbers fired the gun, contrary to the finding of the trial judge. There was no evidence presented in this trial to show that Jackson personally possessed or fired a weapon during the robbery, or that he *193 harmed Phillibert.[9] There was no evidence that Jackson carried a weapon or intended to harm anybody when he walked into the store, or that he expected violence to erupt during the robbery. There was no real opportunity for Jackson to prevent the murder since the crime took only seconds to occur, and the sudden, single gunshot was a reflexive reaction to the victim's resistance. No other innocent lives were jeopardized.
Upon this record, we find insufficient evidence to establish that Jackson's state of mind was culpable enough to rise to the level of reckless indifference to human life such as to warrant the death penalty for felony murder. Accord White v. State, 532 So.2d 1207, 1221-22 (Miss. 1988) (Enmund and Tison are not satisfied in murder case with multiple defendants and no eyewitnesses where all evidence is circumstantial and the actual killer is not clearly identified). To give Jackson the death penalty for felony murder on these facts would qualify every defendant convicted of felony murder for the ultimate penalty. That would defeat the cautious admonition of Enmund and Tison, that the constitution requires proof of culpability great enough to render the death penalty proportional punishment, and it fails to "genuinely narrow the class of persons eligible for the death penalty." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).
Although the Tison issue is dispositive, we find it appropriate to address a circumstance peculiar to this case. We are aware that in the case of Jackson's brother, Nathaniel, this Court affirmed the conviction and sentence of death imposed in separate proceedings for the same armed robbery and murder. Jackson v. State, 502 So.2d 409 (Fla. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 686 (1987). We are also aware that in Nathaniel's case, the evidence included Nathaniel's statement that Clinton Jackson, the appellant here, was the gunman who fired the shot that killed Phillibert. While the two results appear to be inconsistent, we emphasize that this Court decides cases solely based on the record under review. We must blind ourselves to facts not presented in this record.
For the aforementioned reasons, we affirm the convictions for armed robbery and first-degree felony murder, but we vacate the sentence of death and remand to the circuit court for imposition of a sentence of life imprisonment.
It is so ordered.
OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
EHRLICH, Senior Justice, concurs in part and dissents in part with an opinion, in which SHAW, C.J., concurs.
EHRLICH, Senior Justice, concurring in part and dissenting in part.
I concur in the majority's conclusion that there is sufficient competent evidence in the record to support the guilty verdicts as to armed robbery and felony murder. I must dissent, however, from that portion of the majority's decision which concludes that there is insufficient evidence of Jackson's state of mind in accordance with Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), to warrant the death penalty for felony murder.
Initially, I must take issue with the majority's characterization of the action of the gunman in murdering the victim as being a "reflexive" reaction to the victim's resistance. Op. at 186, 192. There is no evidence in the record to support the conclusion that this action was a reflex. This is mere supposition on the part of the majority. It could just as easily be assumed that the defendant formulated an intention, before he ever entered the store, to shoot the victim if he resisted. We cannot, however, draw a conclusion either way based on the record before this Court.
*194 I also disagree that Tison requires that the defendant's death sentence be vacated. In Jackson v. State, 502 So.2d 409 (Fla. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 686 (1987), we set forth directions to the trial courts to ensure a defendant's right to an Enmund factual finding and to facilitate appellate review of this issue:
The jury must be instructed before its penalty phase deliberations that in order to recommend a sentence of death, the jury must first find that the defendant killed or attempted to kill or intended that a killing take place or that lethal force be employed. No special interrogatory jury forms are required. However, trial court judges are directed when sentencing such a defendant to death to make an explicit written finding that the defendant killed or attempted to kill or intended that a killing take place or that lethal force be employed, including the factual basis for the finding, in its sentencing order.
Jackson, 502 So.2d at 413.
Subsequent to this Court's decision in Jackson, the United States Supreme Court revisited Enmund in Tison, stating:

Enmund held that when "intent to kill" results in its logical though not inevitable consequence  the taking of human life  the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.
Tison, 107 S.Ct. at 1688. The court concluded that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id.
In the present case, the trial judge's sentencing order clearly followed the dictates of this Court in Jackson. I would conclude that the dictates of Tison were also satisfied. The trial judge stated that the testimony of Melvin Jones regarding the defendant's statement before the event, the defendant's statement that "We had to do it" and other evidence clearly established the defendant's planning of the robbery and his presence when it took place. The trial judge also concluded that the defendant's statement that "We had to do it" established his intent that lethal force be used and demonstrated his reckless indifference to human life.[10]
I would affirm the sentence of death recommended by the jury and imposed by the trial judge. Accordingly, I respectfully dissent.
SHAW, C.J., concurs.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] In a separate proceeding, Nathaniel Jackson also was convicted of armed robbery and first-degree murder stemming from this incident, and was sentenced to death. This Court affirmed his convictions and death sentence. Jackson v. State, 502 So.2d 409 (Fla. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 686 (1987).
[3] Jackson and his visitors were separated by a glass and wire partition, and there were four to six other inmates talking with their visitors at the same time in that room.
[4] The same problem also may implicate a defendant's constitutional privilege against compelled self-incrimination.
[5] The detective's testimony was erroneously admitted for the reasons we stated for finding error in Jackson's first trial. Jackson v. State, 498 So.2d 906 (Fla. 1986). However, we do not address that error here because Jackson failed to raise it on appeal.
[6] § 921.141(5)(b), (d), (f), Fla. Stat. (1983). The trial court erred in considering the contemporaneous armed robbery conviction in aggravation. Schafer v. State, 537 So.2d 988, 991 (Fla. 1989); Perry v. State, 522 So.2d 817, 818 (Fla. 1988). However, the error is harmless because the other factors constituting this merged aggravating circumstance were proper.
[7] § 921.141(5)(e), Fla. Stat. (1983).
[8] Jackson also claims that the death sentence is disproportional punishment when compared with other Florida capital punishment cases, and that it was error to allow the state to argue to the jury Jackson's lack of remorse and failure to acknowledge guilt. We find no need to address these issues because the other issues we discuss are dispositive.
[9] The contradicted testimony of a detective, who said that Jackson's mother said she "felt" that Jackson was the gunman, was not reliable or probative evidence of Jackson's mental state.
[10] The trial judge erred, however, in concluding that brother Nathaniel Jackson's palm print on the register indicated that Clinton was the "gunman." As the majority recognized, there is no evidence in the record to support this conclusion.