703 So.2d 454 (1997)
Johnny Shane KORMONDY, Appellant,
v.
STATE of Florida, Appellee.
No. 84709.
Supreme Court of Florida.
December 24, 1997.
*456 Nancy A. Daniels, Public Defender and Chet Kaufman, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General; Richard B. Martell, Chief, Capital Appeals and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, for Appellee.

ON REHEARING GRANTED
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Johnny Shane Kormondy. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Kormondy's convictions for one count of first-degree felony murder, three counts of armed sexual battery, one count of burglary of a dwelling with an assault and an intent to commit a theft, and one count of armed robbery. However, we must vacate his sentence of death and remand for a new penalty-phase proceeding before a new jury.
The record reflects the following. The victim Gary McAdams was murdered, with a single gunshot wound to the back of his head, in the early morning of July 11, 1993. He and his wife, Cecilia McAdams, had returned home from Mrs. McAdams' twenty-year high-school reunion. They heard a knock at the door. When Mr. McAdams opened the door, Curtis Buffkin was there holding a gun. He forced himself into the house. He ordered the couple to get on the kitchen floor and keep their heads down. James Hazen and Johnny Kormondy then entered the house. They both had socks on their hands. The three intruders took personal valuables from the couple. The blinds were closed and phone cords disconnected.
At this point, one of the intruders took Mrs. McAdams to a bedroom in the back. He forced her to remove her dress. He then forced her to perform oral sex on him. She was being held at gun point.
Another of the intruders then entered the room. He was described as having sandy-colored hair that hung down to the collarbone. This intruder proceeded to rape Mrs. McAdams while the first intruder again forced her to perform oral sex on him.
She was taken back to the kitchen, naked, and placed with her husband. Subsequently, one of the intruders took Mrs. McAdams to the bedroom and raped her. While he was raping her, a gunshot was fired in the front of the house. Mrs. McAdams heard someone yell for "Bubba" or "Buff" and the man stopped raping her and ran from the bedroom.[1] Mrs. McAdams then left the bedroom *457 and was going towards the front of the house when she heard a gunshot come from the bedroom. When she arrived at the kitchen, she found her husband on the floor with blood coming from the back of his head. The medical examiner testified that Mr. Mc-Adams' death was caused by a contact gunshot wound. This means that the barrel of the gun was held to Mr. McAdams' head.
Kormondy was married to Valerie Kormondy. They have one child. After the murder, Mrs. Kormondy asked Kormondy to leave the family home. He left and stayed with Willie Long. Kormondy told Long about the murder and admitted that he had shot Mr. McAdams. He explained, though, that the gun had gone off accidentally. Long went to the police because of the $50,000 reward for information.
A grand jury indicted Kormondy, Buffkin, and Hazen on July 27, 1993. Each was ultimately tried separately. Buffkin was offered a plea bargain by the State in return for assistance in the prosecution of Kormondy and Hazen. On July 7, 1994, Kormondy was found guilty of first-degree murder, three counts of sexual battery with the use of a deadly weapon or physical force, burglary of a dwelling with an assault or while armed, and robbery while armed. Kormondy's motions for acquittal as to premeditated murder and for a new trial were denied. A penalty-phase proceeding was then held and the jury recommended, by a margin of eight to four, that a death sentence be imposed. Prior to imposing Kormondy's sentence, the trial judge held Kormondy in contempt of court for refusing to testify, with use immunity, against Hazen. Subsequently, on October 7, 1994, the trial judge imposed the sentence of death. The following statutory aggravating factors were found: (1) the defendant was previously convicted of a felony involving the threat of violence to the person; (2) the capital felony was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit a burglary; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the capital felony was committed for pecuniary gain; and (5) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. In explaining his finding of the third of these aggravating factors, the trial judge wrote in the sentencing order that "Buffkin testified that Kormondy had (over his vehement protest) pulled the hammer of the thirty-eight caliber pistol into cocked and firing position immediately before the weapon discharged." It is asserted that this statement is without record support in this proceeding. Finally, while expressly considering the statutory mitigating circumstances, the trial judge found that no such mitigation had been established.
As to nonstatutory mitigation, the trial judge considered Kormondy's childhood deprivations. He found that "the deprivation, trauma, and loss of paternal comfort and companionship suffered during Kormondy's early years are reasonably established by the evidence as nonstatutory mitigating factors. The Court gives these factors moderate weight." This statement must be tempered by the judge's finding that "[t]he Court is well satisfied that Kormondy is more a product of his failure to choose a positive and productive lifestyle than a victim of family dysfunction." Kormondy also asked the trial judge to consider his drug addiction as nonstatutory mitigation. The judge found that "[a]lthough the fact of Kormondy's drug addiction is established by the evidence, the Court finds that his addiction is not reasonably established as a non-statutory mitigating factor and gives it no weight." The trial court also gave no weight to Kormondy's learning disability and lack of education. Moderate weight was given to the fact that Kormondy was a good employee in the past. The trial court further gave little weight to the fact that Kormondy was drinking alcoholic beverages before the crimes were committed. Little weight was also given to the fact that Kormondy was well-behaved at trial. *458 No weight was given to either the fact that Buffkin received disparate treatment or that Kormondy has a wife and child. As to the former consideration, the trial judge found that the "evidence establishes beyond and to the exclusion of every reasonable doubt that Gary McAdams was in fact killed by defendant Kormondy." Further, no weight was given to Kormondy's suggestion that he cooperated with law enforcement. In denying this suggestion, the trial judge wrote, "It is also significant that when he was subpoenaed by the State to testify against co-defendant Hazen he refused to do so even after having been given use immunity." Finally, the trial judge gave moderate weight to the fact that Kormondy has a personality disorder.
After weighing all factors, the judge imposed the death sentence. Kormondy raises six issues in this appeal. Two of these issues concern the guilt phase of Kormondy's trial. The remaining four issues are properly categorized as penalty-phase claims.

GUILT PHASE
Kormondy first argues that the trial court erred in allowing Deputy Cotton to bolster Willie Long's testimony. Specifically, Kormondy argues that the deputy was allowed to introduce a critical piece of factual evidence to the jury even though Long was unable to remember that fact himself. Long testified that Kormondy spoke with him concerning the murders shortly after they occurred. According to Long, Kormondy said on one occasion that "[t]he only way they would catch the guy that shot Mr. McAdams was if they were walking right behind us." Long then testified that Kormondy, on another occasion, admitted to shooting McAdams in the back of the head. Long went to his friend Chris Robarts and told him of the confession. Robarts and Long agreed that Robarts should go to the police with the news about Kormondy's confession and that they would split the $50,000 reward. Deputy Cotton and Deputy Hall came to see Long. He told the detectives of Kormondy's confession. When testifying at trial, though, he could not remember the exact details that he conveyed to the detectives. The following exchange is of particular import to this appeal:
Q. Now, when you were interviewed by Deputies Cotton and Hall after he told you this, did you tell them about the defendant saying which gun was used to shoot Mr. McAdams?
A. It was brought up. I reallyit's been almost a year ago, so I vaguely remember exactly word for word what I said, but to my knowledge, Shane never had a gun that I have ever seen. And I might have said that, yes, sir, I might have. I really can't remember.
Q. Do you recall the defendant telling you that he shot him with the man's own gun?
A. And I want to say yes, I would hate to say yes and it not be true.
Q. Were the deputieswere they taking notes and writing down what you said?
A. Yes, sir. Word for word, everything I said, they wrote down.
Q. Would you say that when you told them what he told you, that it was fresher in your mind?
A. Oh, yes sir. It was within three or four days after he told me.
Q. No further questions.
The State then put Deputy Cotton on the stand to testify that Long had conveyed that Kormondy confessed to using the homeowner's gun to commit the shooting. The defense objected to this testimony as being hearsay. The objection was overruled. On appeal, Kormondy claims that the admission of Deputy Cotton's testimony as to this particular fact constitutes reversible error. We agree that Cotton's testimony was hearsay and that no hearsay exceptions apply in this situation. We need not review in detail the hearsay exceptions because the State essentially concedes that no such exceptions apply. Indeed, the State explains that the prosecutor followed "the dictates of logic more closely than the letter of the hearsay rule." The State instead argues that any error was harmless beyond a reasonable doubt. After examining the specific facts of this case, we agree. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Surely Cotton's *459 testimony was not needed to establish that McAdams' gun was used to commit the murder. Testimony offered by Ed Love from the Florida Department of Law Enforcement indicated that the fatal bullet was fired by either a .38 special or a .357 magnum caliber revolver. He expressly stated that the fatal bullet was not fired by a .44 caliber gun. It was stipulated that Buffkin carried a .44 caliber gun into the McAdams' home. A friend of Mr. McAdams, Lyn Hart, testified that McAdams owned a .38 caliber Model 10 Smith and Wesson pistol. Therefore, Cotton's testimony was simply superfluous in supporting the conclusion that McAdams' own gun was used in his murder. Kormondy further claims, though, that he was prejudiced by Deputy Cotton's bolstering of Long's testimony. In other words, Deputy Cotton allegedly added credibility to Long's statement. Cotton's testimony went almost exclusively to the gun that was used to kill McAdams.[2] Very little, if any, of his testimony can be characterized as verifying the identity of the triggerman.[3] Further, Long was subjected to extensive cross-examination by the defense. The jury was given ample opportunity to assess Long's credibility. We find that, in light of the totality of the evidence presented, Cotton's testimony cannot reasonably be said to have bolstered Long's credibility. Accordingly, we find that no relief is warranted on this issue.
Kormondy next argues that the trial court erred in its handling of Kormondy's motion for acquittal as to first-degree premeditated murder. Primarily, Kormondy argues that the trial court should have granted a judgment of acquittal as to the charge of premeditated murder because the State's own evidence failed to discount the reasonable hypothesis that the shooting was accidental. We agree. When the State relies upon circumstantial evidence to support a conviction for premeditated first-degree murder, a motion to acquit as to such murder must be granted unless the State can "present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Kirkland v. State, 684 So.2d 732, 735 (Fla.1996) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)). Indeed, if "the State's proof fails to exclude a reasonable hypotheses [sic] that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained." Hoefert v. State, 617 So.2d 1046, 1048 (Fla. 1993). We find that the State failed, with its evidence, to exclude the reasonable possibility that the shooting was accidental. Long (the State's primary witness putting the murder weapon in Kormondy's hand) stated that Kormondy mentioned something about the "gun going off accidentally." Even Kormondy, when implicating Buffkin as the shooter in his statement to the police, explained the situation as follows:
MR. HALL: And then the gun went off.
MR. KORMONDY: Yes.
MR. HALL: When y'all were back at your house that night, did [Buffkin] ever talk about that he did not intentionally shoot this man or did he ever make any statement like that?
MR. KORMONDY: Yes. He said, I didn'tdidn't really mean for it to go off. I didn't mean for the gun to go off.
Outside of the statements made by Kormondy indicating the accidental nature of the shooting, the remaining evidence is circumstantial in nature. "`Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.'" Holton v. State, 573 So.2d 284, 289 (Fla.1990) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). In this case, the evidence indicates that the victim's own gun was used in the shooting. While certainly not precluding a finding of premeditation, the use of a weapon acquired after entering the home indicates both an unfamiliarity *460 with the weapon and a lack of any plan to use Buffkin's gun to kill the inhabitants of the home. Next, the evidence indicates that the victim and his wife cooperated throughout the ordeal. The fact that the phones were disconnected from the walls further demonstrates that the defendants were not provoked by a fear of the victims' immediate communication with authorities. There is no evidence that the perpetrators and the victims knew each other prior to the criminal episode. Finally, while a single gunshot can support a finding of premeditation in some factual situations, e.g., Peterka v. State, 640 So.2d 59 (Fla.1994), it does not necessarily lead to such a conclusion. The State did present testimony from a firearms expert indicating that it would be "quite unlikely" that a gun similar to the one owned by McAdams, if in good working order, would fire accidentally from simply "punching like on the head with the gun." Here, though, the State failed to present any evidence that the gun was in good working order just prior to the shooting. In sum, although the evidence in this case is in fact consistent with an unlawful killing, it cannot support a finding of premeditation. Despite our ruling on premeditation, the record clearly supports a conviction for first-degree felony murder. See Terry v. State, 668 So.2d 954 (Fla.1996)(finding sufficient evidence only to support first-degree felony murder); Jackson v. State, 575 So.2d 181 (Fla.1991); Van Poyck v. State, 564 So.2d 1066 (Fla.1990). Accordingly, we affirm Kormondy's conviction for first-degree murder.

PENALTY PHASE
Kormondy raises four penalty-phase issues. Generally, these four issues can be described as follows: (1) whether the trial court erred in admitting bad character evidence in the form of unconvicted crimes or nonstatutory aggravating circumstances; (2) whether the trial court erred in its treatment of aggravating circumstances; (3) whether the trial court erred in its treatment of mitigation; and (4) whether the death sentence is unconstitutional or, more specifically, disproportionate. Insofar as we find reversible error in his first issue, we need not address the remaining issues. We will note, however, certain other errors that should be avoided in the new penalty-phase proceeding.
The trial court reversibly erred in allowing attorney Kevin Beck to testify, on cross-examination by the State, as to a statement Kormondy allegedly made to Buffkin in jail after this murder. Beck had knowledge of this alleged statement because he served as Buffkin's trial attorney. Kormondy allegedly told Buffkin that he would kill Mrs. McAdams and Willie Long if he ever got out of prison. When the State tried to elicit this information during Beck's cross-examination, the defense objected. The relevant exchange transpired as follows:
Q [State]: Your client indicated to you that if he [Kormondy] got out, he was going to kill Will Long and Mrs. McAdams because she could identify him?
A [Beck]: I'm sorry. Would you repeat the question?
[Defense]: Objection. Objection. May we approach the bench?
THE COURT: Yes.
(At the bench:
[Defense]: I'm going to object to the relevance of this, Your Honor. The State made the plea offer to Buffkin before they had the opportunity to take his statement so that we're not aware of any statements that Kormondy may have made to him. This is irrelevant.
[State]: No, I was aware from two different sources, one was a source of a man who was in jail in Santa Rosa County that wrote letters to Mrs. McAdams that were turned over to me and my investigator, that he planned to go back and kill her, and we didn't call that witness. Okay. The second source was a client of the Public Defender's Office.
THE COURT: Let me ask you this. Am I understanding correctly that you say that he intended to go back during that event and kill her or at some subsequent point in time?
[State]: Some subsequent point in time because she was a witness, therefore underlining the idea of witness elimination. Now, I can show this Court at any time necessary that we had such information *461 before I basically even picked this jury, long before that. We questioned whether it was credible, but after we got a statement of Mr. Buffkin, we knew that it wasn't. Secondly, we have another witness who's here today, Mr. Dubois, the public defender has deposed who has also said that he admitted basically to killing him and he said that we had to do what we had to do. And that provides a good-faith basis. The question really is, is it beyond the scope of direct examination? That's the question, not whether it's relevant.
THE COURT: That's discretionary with the Court. I think it does have relevance under 401.
[Defense]: Your honor, first of all, let's make it clear that these statements that Kormondy allegedly made were made in jail months after their capture. This is not made the night of the event.
[State]: That's true.
[Defense]: Okay. So we're not talking about witness elimination the night of the event. Clearly, he had a chanceI have not suggested there was not any witness elimination involved. I've not put on any rebuttal evidence to that at this point to rebut his aggravator. If he wants to rely on that, that's fine. But he's rested. He can't present this now to prove that up.
THE COURT: Well, let me just say this, that the jury I believe can permissibly infer from that that witness elimination was a part and parcel of the plan from the inception even from statements that were made subsequent to the acts having occurred. That's a permissible inference that they can draw. The question is not one of 401 relevance. The question is whether or not it's beyond the scope of direct examination and whether or not I should allow that.
[Defense]: Well, it is beyond the scope of the direct, Your Honor. And also, again, it'she had his opportunity to present that evidence during his case in chief. Okay. I've never once suggested during these mitigating circumstances, put on any evidence to say that there was not any witness elimination. Okay. So if what he's now trying to do is anticipatory rebuttal, I haven't put that into play.
THE COURT: Let me also say that these proceedings are governed primarily by a standard of probative value rather than a standard of absolute rules of evidence, to start off with. You know, I think we for the most part are used to using that and that's the tool we've been using, but it's not necessary that it be used in these proceedings. Hearsay is permissible against the defendant provided the defendant has the opportunity to rebut it. The defendant can use hearsay to prove up mitigating circumstances. It's probative value which is thewhich is the standard by which the admissibility of evidence is governed and not the strict rules of the code. I'm going to allow him to go ahead and ask the question. It is beyond the scope of cross-examination but I do think it meets the requirements of 401.
[Defense]: Your Honor, in addition, then it's fundamentally unfair, that its probative value is outweighed by the prejudicial effect to my client. It's fundamentally unfair, arises to that level. If you allow that in, then my client is going to be deprived of an opportunity to have a proper sentencing proceeding, that any resulting sentence would be capricious and arbitrary. It would not be a valid recommendation. It deprives him of his due process rights under the Fifth, Fourteenth Amendment, also the Sixth and Eighth of the U.S. Constitution, also under Article 1, Section 2, 9, and 16 of the Florida Constitution.
THE COURT: Objection is overruled.
Bench conference concluded.)
[State]: Isn't it also true that your client told you, Mr. Buffkin told you, that he had discussed with Mr. Kormondy in the jail after their arrest in this case, and Mr. Kormondy told your client that if he got out, he was going to kill Will Long and he was going to kill Cecilia McAdams because she could identify him?
[Beck]: Just so this is clear, rather than divulging communications that may be privileged, he has given a deposition and testified at deposition, and he did indicate that Mr. Kormondy had told him, while in *462 jail, that if he ever got out, he would in fact kill William Long and Cecilia McAdams, yes, sir.
[State]: Thank you. No further questions.
We confronted a similar situation in Derrick v. State, 581 So.2d 31 (Fla.1991). There we wrote:
During the penalty phase James was allowed to testify over objection that Derrick told James that he had killed Sharma and that he would kill again. Derrick claims that this testimony was irrelevant to the penalty phase and impermissibly showed lack of remorse and the possibility that Derrick would kill again. The state argues that this testimony was relevant to show that the murder was cold, calculated, and premeditated without any pretense of moral or legal justification. The state further argues that the testimony was not impermissibly used to show lack of remorse since the prosecutor never argued lack of remorse and the judge did not instruct the jury on lack of remorse as an aggravating factor.
We agree with Derrick that James's testimony was erroneously admitted and constitutes reversible error. The statement was not relevant to show Derrick's guilt because guilt is not at issue in the penalty phase of a trial. Therefore, the state must show that the statement is relevant to an issue properly considered in the penalty phase. We do not construe James's testimony to support the factor of cold, calculated, and premeditated without any pretense of moral or legal justification because all that Derrick admits in the statement is that he did kill Sharma. The statement makes no reference to a plan to kill Sharma, nor to a lack or justification for the murder. The testimony was not relevant to any other aggravating factor. See Pope v. State, 441 So.2d 1073, 1078 (Fla.1983) ("[L]ack of remorse should have no place in the consideration of aggravating factors."). While the statement would be admissible to rebut evidence of remorse or rehabilitation, it was introduced before the defense presented any evidence. The statement was highly prejudicial because it suggests that Derrick will kill again.
Id. at 36. Beck's cross-examination testimony in this case was just as prejudicial. It indicated that Kormondy would kill again. The State attempts to distinguish the Derrick case, though, as follows:

Derrick is inapplicable [in the case] sub judice. The State did not introduce evidence of any generalized statement on the part of Kormondy to the effect that he would kill person or persons unknown. Rather, as the prosecutor argued below, the statement was relevant to the avoid arrest aggravator, in that it cast light upon Appellant's motivation in killing Gary McAdams; Appellant's statement was to the effect that he would kill Cecilia McAdams, if able, because she could identify him.... Furthermore, this statement could be considered rebuttal to some of the prior psychiatric testimony offered in mitigation to the effect that Kormondy, due to his personality disorder, was "impulsive" and could not "think things out."
We address these assertions successively. First, the State attempts to distinguish Kormondy's alleged statement on the ground that it was specific as to Cecilia McAdams and Willie Long whereas Derrick's alleged statement indicated a general intent to kill again. The specific nature of Kormondy's alleged statement, the State argues, makes it relevant to the avoid-arrest aggravating factor. We disagree. In the circumstances attending this case, we cannot find that a statement allegedly made in jail (after the relevant criminal episode) as to a future intent to kill sheds any light on Kormondy's intent at the time of the crime.[4] Indeed, *463 Mrs. McAdams was not killed when her husband was shot. Further, Kormondy did not kill Long, despite having opportunities,[5] after having confessed to him. His sentiment about future killings seems to have arisen after capture. It is simply too prejudicial to allow such speculative evidence to prove Kormondy's intent at the time of the shooting. We also note that Beck's cross-examination clearly exceeded the scope of the direct examination. The trial judge even conceded as much in his ruling on Kormondy's objection.
In the alternative, the State argues that the testimony is relevant to rebut the mitigation evidence indicating that Kormondy was "impulsive" and could not "think things out." This assertion is meritless in our view because, in the way the Statement was presented by the state, it became another nonstatutory aggravating factor.
In sum, we find that Beck's cross-examination testimony was highly inflammatory and could have unduly influenced the penalty-phase jury. The manner in which the cross-examination was conducted effectively established another nonstatutory aggravating circumstance. It is important to note that our death penalty statute does not authorize a dangerousness aggravating factor.
The jury is charged with formulating a recommendation as to whether Kormondy should live or die. Testimony that Kormondy said he would kill again, when that testimony is not directly related to proving a statutory aggravating circumstance, is outside of the scope of evidence properly presented by the State during the penalty phase. We find that this evidence in this instance constitutes impermissible nonstatutory aggravation. For this evidence to be admissible at the penalty-phase proceeding, it has to be directly related to a specific statutory aggravating factor. Otherwise, our turning of a blind eye to the flagrant use of nonstatutory aggravation jeopardizes the very constitutionality of our death penalty statute. Finally, we are unable to say that this evidence about Kormondy's desire to commit future killings, when presented to the jury by an attorney, was harmless beyond a reasonable doubt.
Accordingly, for the reasons expressed, we affirm Kormondy's conviction for first-degree felony murder; we find insufficient evidence to support a finding of premeditation; and we vacate Kormondy's sentence of death and remand for a new penalty-phase proceeding in front of a new jury. Further, we affirm Kormondy's convictions for three counts of armed sexual battery, one count of burglary of a dwelling with an assault and an intent to commit a theft, and one count of armed robbery. We note that Kormondy was sentenced to a life sentence for each of these five convictions. Each of the five life sentences is to run consecutively. Also, each life sentence carries a three-year minimum mandatory imprisonment that will "run concurrently with each count."
In conducting the new penalty-phase proceeding, we caution the trial court on two points. Clearly, a murder cannot be cold, calculated and premeditated without any pretense of moral or legal justification if premeditation is not established.[6] Next, it is crucial that a sentencing order only reflect facts drawn from the record in the particular case. Here, the State concedes that the order contains extra-record facts. Those facts were used as a partial basis for the judge's finding of a statutory aggravating *464 circumstance. We have previously found error in such situations. Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996) cert. denied,___ U.S. ___, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).[7] On remand, attention should be paid to keeping separate the facts from the Buffkin, Hazen, and Kormondy cases.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW and ANSTEAD, JJ., concur.
GRIMES, Senior Justice, concurs in result only with an opinion in which HARDING and WELLS, JJ., concurs.
HARDING, J., concurs in result only as to conviction and concurs as to sentence.
GRIMES, Senior Justice., concurring in result only.
I cannot agree that the trial court should have granted a judgment of acquittal on the charge of premeditated murder.
Gary McAdams was executed with a single shot to the back of the head that was fired from above at point-blank range at a time while the gun was in contact with McAdams' flesh. The bullet recovered from Mr. McAdams' brain was a .38- or .357-caliber, which was consistent with the gun the intruders took from the victim's bedroom. The only gun that the three intruders brought into the house was a .44-caliber. While the murder weapon was never recovered, the individual who had given the gun to the McAdamses testified that it had been in good working order at the time he had done so. A ballistics expert testified that the "trigger pull" on a gun of this type in good working order would be approximately ten to twelve pounds and that it would be "quite unlikely" for the gun to fire without being cocked. The witness further stated that the gun had two internal safeties, a "rebound" and a "hammer block" which would mean that even if dropped the gun would not go off accidentally.
The majority recites the general rule that when the State relies upon circumstantial evidence to support a conviction for premeditated first-degree murder, a motion to acquit must be granted unless the State can present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Kirkland v. State, 684 So.2d 732 (Fla. 1996). A corollary to that rule is that the State is not required to conclusively rebut every possible variation of events that could be inferred from the evidence but only to introduce competent evidence which is inconsistent with the defendant's theory of events. State v. Law, 559 So.2d 187 (Fla.1989). Moreover, the jury is not required to believe a defendant's contention that he accidentally shot the victim. Pietri v. State, 644 So.2d 1347 (Fla.1994).
Here, Kormondy was shown to be lying on several matters. His contention that he did not rape Mrs. McAdams was refuted by her testimony as well as the presence of fibers from her dress in the driver's area of Kormondy's car. His assertion that he shot the victim accidentally is contradicted by his statement to the police in which he claimed that Buffkin was the shooter. Moreover, there is reason to believe that the intruders intended to kill McAdams from the outset. One of Kormondy's accomplices was raping Mrs. McAdams in another room when he heard the shot which killed Mr. McAdams. He then fired a gun into the floor and left the room. There would have been no purpose for him to do this other than to convince his cohorts that he had also killed Mrs. McAdams as originally planned. Finally, it is clear that the McAdamses fully cooperated with their captors and there was no evidence on Mr. McAdams' body of defensive wounds or any sign of a struggle. There was no reason for Kormondy to shoot Mr. McAdams, who was lying on the floor, unless he intended to do so.
I am convinced that there was sufficient evidence for the jury to conclude that this was a premeditated murder.
HARDING and WELLS, JJ., concur.
NOTES
[1] Kormondy, in this case, and Hazen, in Hazen v. State, 700 So.2d 1207 (Fla.1997), present different factual scenarios. The trial records are inconsistent as to the locations of Hazen and Buffkin at the time of the fatal shot. During Kormondy's trial, Mrs. McAdams testified that Buffkin was with her in the back of the house when she heard a shot fired. Officer Hall testified that Kormondy told him in an unrecorded statement that Buffkin fired the fatal shot and Hazen was in the back of the house with Mrs. McAdams. In a tape-recorded confession played for the jury, Kormondy again said that Buffkin shot the victim. During Hazen's trial, Buffkin testified that Kormondy killed the victim and Hazen was in the back room with Mrs. McAdams. Hazen testified that he was not present at the scene when the crimes against the McAdamses were committed.
[2] He also testified briefly as to the videotaping and capture of Kormondy.
[3] In this respect, Cotton's testimony is significantly distinct from Long's statements. Long was able to put the murder weapon in Kormondy's hand. Cotton's testimony focused on which gun was used in the shooting.
[4] The State cites Floyd v. State, 569 So.2d 1225 (Fla.1990), in support of its position. In Floyd, the State was allowed to present testimony indicating that Floyd had confessed to his cellmate. He then threatened to "get him" when he learned of his cellmate's intention to testify against him. The State introduced this testimony in order to demonstrate Floyd's guilty knowledge of the burglary. We found that such testimony was "relevant to establishing the aggravating circumstance of murder committed during a burglary, section 921.141(5)(d), Florida Statutes (1983), which must be proved beyond every reasonable doubt." Id. at 1230-31. A distinction must be drawn, though, between using knowledge of a burglary to establish that a murder was committed during said burglary and using one's intent to commit a future crime to prove intent, in the past, to eliminate witnesses and avoid arrest. It is unlikely that Floyd confessed to a burglary and then threatened to "get" his cellmate for revealing such confession if he had no guilty knowledge of the burglary. It is far more likely, however, that Kormondy formed his intent to kill Mrs. McAdams and Mr. Long after the original criminal episode ended. A later-formed intent to kill in the future is not relevant, in these circumstances, to prove his intent at the time of the crime. We find Floyd to be inapposite.
[5] Kormondy was not captured immediately after his first revelation to Long. Rather, Kormondy and Long spoke on at least three occasions about the incident.
[6] In view of our disposition of Kormondy's first penalty-phase issue, we need not determine whether the trial judge's finding of this statutory aggravating factor was harmless beyond a reasonable doubt.
[7] Once again, we need not address whether such error in this case might be harmless beyond a reasonable doubt.