586 So.2d 1024 (1991)
Mac Ray WRIGHT, Appellant,
v.
STATE of Florida, Appellee.
No. 71534.
Supreme Court of Florida.
August 29, 1991.
Rehearing Denied October 30, 1991.
*1025 Richard L. Jorandby, Public Defender and Jeffrey L. Anderson, Asst. Public Defender, Fifteenth Judicial Circuit, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Giselle D. Lylen, Asst. Atty. Gen., Miami, for appellee.
BARKETT, Justice.
Mac Ray Wright appeals from his convictions of first-degree murder and the sentence of death, along with other convictions and sentences stemming from the same trial. We reverse the convictions, vacate the sentences, and remand with instructions as set forth below.[1]
*1026 The victim, Sandra Ashe, lived with her children in a single-family dwelling that was owned by her mother, Bessie Webster, and leased to Ashe in Ashe's name. The appellant, Mac Ray Wright, fathered children with Ashe and lived at the house off and on.[2] Testimony revealed a long history of domestic problems between Ashe and Wright. Wright was known by friends and relatives to have trouble controlling his temper, a problem exacerbated by heavy consumption of alcohol. Witnesses testified that he had been abusing alcohol for many years.
On June 8, 1986, Ashe drove to the home of Dedilia Gayle (a/k/a Dee Dee Morgan), a girlfriend of Wright's for nearly three years. Latonya Ashe, one of Ashe's daughters, said her mother became upset when Ashe saw Wright's car at Gayle's house because Wright "had told a story that he wasn't messing with Dee Dee no more." Later that night, Latonya overheard her mother and Wright fight about Wright's relationship with Gayle. Ashe demanded that Wright return her house key and threatened to call the police if Wright refused. She changed the locks on her door the next day, June 9.
Gayle testified that on June 10, the day of the shooting, she saw Wright in the street. He got $10 from a friend and said he was going to a bar. Later that night, Wright went to her house and drank as many as six beers before he left at about 10 p.m. Odessa Ingram, another former girlfriend of Wright's, said that between 8:30 and 9 p.m. on June 10, she saw Wright sitting in his car, drinking. She described him as "drunk, intoxicated"; he "looked wild"; his eyes were "real red"; his speech was slurred; and he did not recognize her.
At around 11-11:30 p.m. on June 10, Wright tried to use his key to enter Ashe's house. When he could not get in, Wright went to a window and pushed out a screen. He called for Ashe's children to let him in, but they didn't respond. Finally, he knocked down the back door and the kitchen door, entered the house, and started shooting and cursing. Ashe, struck by the bullets, fell outside the house as she tried to flee. Ashe died of bleeding caused by four gunshot wounds, three of which could have been fatal.
On June 16, after talking to his sister, Wright turned himself in to authorities and was booked at the St. Lucie County Jail. When officers accused Wright of the murder, he went berserk. Officer Peggy Gahn testified that Wright picked up a table, struck her, and said "I'm gonna kill you." Wright then struck deputy Gary Farless with a closed fist. Other evidence presented through various witnesses indicated that Wright appeared to have been drinking heavily before he turned himself in. Deputy Lee Morris said Wright appeared to be drunk and spaced out when he surrendered himself to deputies that day. Morris described Wright as having acted like an "absolute wild man," or an "ape" during the altercation.
In the penalty phase, the state showed that Wright previously had been convicted of two counts of aggravated assault, one count of battery of a police officer, and two counts of simple assault. Wright presented witnesses to establish that he and Ashe had a history of domestic disputes, but that they would always get back together. Wright provided for Ashe and the children, was a good father, and took care of his sister who had terminal cancer. Wright's parents had separated when he was young, so he was one of eight children raised by only his mother. One of Wright's brothers had been accidentally shot to death in 1979. Wright was a slow learner, and as a child he often felt headaches, a problem that continued into adulthood. Mental illness ran in his father's family, and he suffered from severe nervous attacks that caused him to shake. His employer said he was a very good worker as a block mason, he took orders and commands well, and he would still be employed but for the criminal charges.
*1027 Wright testified that he had an argument with Ashe the day before the murder. The next day, after drinking alcohol and taking the drug percodan, he went over to Ashe's house to talk. When he could not get into the house with his key, he opened the back door and they argued again. He could not remember the details of the murder, but he remembered "this big explosion or this quick snap what had happened." He loved Ashe before and after the killing, and he felt very remorseful.
Psychiatrist Dr. Carmine Ebalo said in the penalty phase that Wright suffered a disturbance in jail that caused him to shake and lose sleep, for which he required medication. She said Wright told her he could not remember much about the murder. He remembered that Wright and Ashe had fought, and the next thing he knew he was walking on the street when he was told police were looking for him. Wright's family has a history of explosive temper and alcoholism, and for many years he had been heavily drinking alcohol, consuming as much as a half-gallon of gin in twenty-four hours. Wright also had been regularly using the drug percodan for six years, and he admitted to having been a user of speed, valium, and marijuana, smoking about two marijuana cigarettes daily. Dr. Ebalo concluded that if Wright had been under the influence of alcohol or drugs on the night of the murder, he was emotionally disturbed and his ability to function was diminished.
The jury found Wright guilty of first-degree murder, burglary, and two counts of battery on a police officer. The jury recommended a life sentence for the murder, but the court overrode the recommendation, finding that the murder was heinous, atrocious, or cruel;[3] cold, calculated, and premeditated without any legal or moral justification;[4] the murder was committed while Wright was engaged in a burglary or attempted burglary;[5] and Wright had three previous violent felony convictions.[6] The court found no statutory mitigation, but found nonstatutory mitigation in that Wright was remorseful in court; had a recent history of being a good worker when not in prison; had a family history of mental illness; was raised by his mother in a home of eight after his father left home when Wright was only ten years old; and had a history of alcohol and substance abuse. The court also found that Wright had been drinking alcohol and may have been taking another drug before he committed the murder.

I. JURY SELECTION
We begin by agreeing with Wright's claim that the state unconstitutionally exercised a peremptory challenge for racial reasons. In State v. Neil, 457 So.2d 481 (Fla. 1984), clarified, State v. Castillo, 486 So.2d 565 (Fla. 1986), we established procedures to eliminate the racially discriminatory use of peremptory challenges as required by article I, section 16 of the Florida Constitution. First,
[a] party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and that there is a strong likelihood that they have been challenged solely because of their race.
Neil, 457 So.2d at 486 (footnote omitted). We clarified that standard in State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), where we said that trial courts must exercise their discretion "to provide broad leeway in allowing parties to make a prima facie showing that a `likelihood' of discrimination exists." Slappy, 522 So.2d at 22. If a judge is in doubt, the doubt should be weighed in favor of conducting an inquiry. See Thompson v. State, 548 So.2d 198, 202 (Fla. 1989). In the instant case, Wright, an African American, timely objected after the state peremptorily excused three African American members of the venire, and the *1028 trial court properly exercised its discretion to require the state to explain the challenges. This part of the procedure was spelled out in Slappy:
Once a trial judge is satisfied that the complaining party's objection was proper and not frivolous, the burden of proof shifts. At this juncture, Neil imposes upon the other party an obligation to rebut the inference created when the defense met its initial burden of persuasion. This rebuttal must consist of a "clear and reasonably specific" racially neutral explanation of "legitimate reasons" for the state's use of its peremptory challenges. Batson [v. Kentucky, 476 U.S. 79, 96-98 & n. 20, 106 S.Ct. 1712, 1722-24 & n. 20, 90 L.Ed.2d 69 (1986)]. While the reasons need not rise to the level justifying a challenge for cause, they nevertheless must consist of more than the assumption

that [the veniremen] would be partial to the defendant because of their shared race. ... Nor may the [party exercising the challenge] rebut the defendant's case merely by denying that he had a discriminatory motive or "affirming his good faith in individual selections." ... If these general assertions were accepted as rebutting a ... prima facie case, the Equal Protection Clause "would be but a vain and illusory requirement."

Id. at 97-98 [106 S.Ct. at 1723] (quoting Alexander v. Louisiana, 405 U.S. 625, 632 [92 S.Ct. 1221, 1226, 31 L.Ed.2d 536] (1972), and Norris v. Alabama, 294 U.S. 587, 598 [55 S.Ct. 579, 583-84, 79 L.Ed. 1074] (1935)). Part of the trial judge's role is to evaluate both the credibility of the person offering the explanation as well as the credibility of the asserted reasons. These must be weighed in light of the circumstances of the case and the total course of the voir dire in question, as reflected in the record.
... [A] judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact. In order to permit the questioned challenge, the trial judge must conclude that the proffered reasons are, first, neutral and reasonable and, second, not a pretext. These two requirements are necessary to demonstrate "clear and reasonably specific ... legitimate reasons." Batson, 476 U.S. at 98 n. 20 [106 S.Ct. at 1723 n. 20]. Moreover, they serve the goal of demonstrating a "neutral explanation related to the particular case to be tried," id. at 98 [106 S.Ct. at 1723], and that "the questioned challenges were not exercised solely because of the prospective jurors' race." Neil, 457 So.2d at 486-87 (footnote omitted).
Slappy, 522 So.2d at 22 (emphasis supplied).
In Wright's case, the state explained its challenge of venire member Salter by saying that Salter "would be able to identify himself more with the Defendant, since they are both black males of essentially the same age." The prosecutor then offered an alternative ground for challenging venire member Salter, explaining that there had been no eye contact between Salter and the prosecutor, and "I felt uncomfortable about that."
This was a clear violation of Neil and Batson. The first explanation was based on the prosecutor's assumption that the prospective juror would be partial to Wright because of their shared race, a reason expressly proscribed in Batson, 476 U.S. at 97, 106 S.Ct. at 1723, and Slappy, 522 So.2d at 22. The alternative explanation was merely pretextual. In Slappy we provided a list of nonexclusive factors tending to show that the asserted reasons for a peremptory challenge are either not supported by the record or are impermissible pretext:
(1) alleged group bias not shown to be shared by the juror in question, (2) failure to examine the juror or perfunctory examination, assuming neither the trial court nor opposing counsel had questioned the juror, (3) singling the juror out for special questioning designed to evoke a certain response, (4) the prosecutor's reason is unrelated to the facts of the case, and (5) a challenge based on reasons *1029 equally applicable to juror[s] who were not challenged.
Slappy, 522 So.2d at 22. We elaborated by adding that
[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported... . [P]rosecutors' peremptories are based on their "seat-of-the-pants instincts." ... Yet "seat-of-the-pants instincts" may often be just another term for racial prejudice. Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels....
Slappy, 522 So.2d at 23 (quoting Batson, 476 U.S. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring) (citations omitted)). Peremptory challenges based on bare looks and gestures are not acceptable reasons unless observed by the trial judge and confirmed by the judge on the record. For the foregoing reasons, we conclude that the state's challenge of venire member Salter violated Wright's constitutional right to trial by an impartial jury. Art. I, § 16, Fla. Const.[7] Hence, we reverse the convictions and resulting sentences.

II. GUILT PHASE
Although the Neil issue itself is dispositive, we address other errors to instruct the court in the event of a retrial.[8] First, we find reversible error in the trial court's denial of Wright's pretrial motion to sever the charges of murder and burglary from the charges of battery on a law enforcement officer. Florida Rule of Criminal Procedure 3.150(a) provides:
(a) Joinder of Offenses. Two or more offenses which are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on two or more connected acts or transactions.

(Emphasis added.) Rule 3.152(a) provides:
(a) Severance of Offenses.
(1) In case two or more offenses are improperly charged in a single indictment or information, the defendant shall have a right to a severance of the charges upon timely motion thereof.
(2) In case two or more charges of related offenses are joined in a single indictment or information, the court nevertheless shall grant a severance of charges on motion of the State or of a defendant.
(i) before trial upon a showing that such severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense, or
(ii) during trial, only with defendant's consent, upon a showing that such severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.
In Garcia v. State, 568 So.2d 896, 899 (Fla. 1990), we summarized the well-settled law as providing that the
"connected acts or transactions" requirement of rule 3.150 means that the acts joined for trial must be considered "in an episodic sense[.] [T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." Paul [v. State, 365 So.2d 1063, 1065-66 (Fla. 1st DCA 1979) *1030 (Smith, J., dissenting), adopted in part, 385 So.2d 1371, 1372 (Fla. 1980)]. Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." Bundy [v. State, 455 So.2d 330, 345 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986)]. However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence. [State v.] Williams, 453 So.2d 824, 825 (Fla. 1984).
Garcia and the cases on which it relied require reversal here because the charges of battery on a law enforcement officer were not episodically connected with the other charges in this case. The episode involving the battery charges was wholly distinct from the episode involving murder and burglary. Each episode involved different offenses, different victims, different times and dates, different places, and different circumstances. The only connection is the fact that the same person was accused of all the crimes. The mere fact that the battery charges arose from Wright's custody on the murder charges is irrelevant to the issue of severance. Hence, we conclude that on remand the trial court must sever the charges of first-degree murder and armed burglary from the charges of battery on a police officer.
One evidentiary issue in the guilt phase requires discussion. Wright claims that the trial court should have barred Ashe's mother, Bessie Webster, from testifying about out-of-court statements made by Ashe. Over Wright's objection, the state adduced testimony to the effect that on the day before the murder, Ashe had told Webster that Wright had broken her nose; that he was no longer allowed in the house; and that she had changed the locks. The trial court allowed the state to introduce the testimony on the basis that it was offered not to prove the truth of the matter asserted, but rather that it was offered only to prove that "something was said to this witness." We conclude that the trial court abused its discretion. The only relevance of this out-of-court statement was to prove the truth of the matters asserted by the declarant, Ashe. Therefore, the evidence was hearsay. See § 90.801(1)(c), Fla. Stat. (1985).
Wright also raises two jury instruction issues that warrant discussion. First, we agree with his claim that the trial court erred by instructing the jury to infer consciousness of guilt from flight. A prerequisite for giving the flight instruction is that evidence must have been presented to support it. See, e.g., Jackson v. State, 575 So.2d 181, 188-89 (Fla. 1991). Merely fleeing the scene of a crime does not support a flight instruction, id., nor does the fact that Wright remained at large for six days. We have reviewed the record and conclude that the evidence does not support a flight instruction.
The second jury-instruction issue challenges the trial court's instruction as to the two charges of battery on a law enforcement officer. Section 784.07 of the Florida Statutes (1985), which defines the substantive offense, requires as an essential element proof that the victim was in fact a law enforcement officer. See Fla. Std.Jury Instr. (Crim.) at 93. Of significance in this case is the last line of the standard instruction, which reads in relevant part:
The court now instructs you that (name official position of victim designated in charge) is a [law enforcement officer].
Id. The record shows that the trial court instructed the jury that Peggy Gahn and Gary Farless, the respective victims, were law enforcement officers. We conclude that the trial court erred. The instruction in effect directed the jury to find as a matter of law that an essential element was proved. Whether these particular persons were law enforcement officers at the time the offense occurred was a matter of fact, and that fact constituted an essential element of the offense. In a jury trial it is the sole province of the jury to determine whether the state has proved each essential element beyond a reasonable doubt. The *1031 instruction here invaded the fact-finding province of the jury.[9]
It is important to note that the instruction given in this case was a misapplication of a proper standard instruction. The standard instruction requires courts to advise jurors that the official position of the alleged victim  not the actual person alleged to be the victim  is a law enforcement officer. A proper application of the standard instruction, for example, would advise the jury as a matter of law that the position of deputy sheriff is a law enforcement officer within the meaning of the offense charged. That would leave for the jury the factual determination of whether the person alleged to be the victim was a deputy sheriff, and therefore, a law enforcement officer.
Finally, we agree with Wright that the trial court erred by departing from the guidelines in sentencing Wright for burglary without a guidelines scoresheet and accompanying contemporaneous written reasons for departure. See, e.g., Bruno v. State, 574 So.2d 76, 83 (Fla. 1991); Ree v. State, 565 So.2d 1329 (Fla. 1990), modified, State v. Lyles, 576 So.2d 706 (Fla. 1991).

III. PENALTY PHASE
Wright challenges the trial court's decision to override the jury's life recommendation on the first-degree murder charge. To sustain a jury override, this Court must conclude that facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Hence, we will not sustain an override unless the jury's life recommendation was entirely unreasonable. E.g., Cooper v. State, 581 So.2d 49 (Fla. 1991); Buford v. State, 570 So.2d 923 (Fla. 1990); Carter v. State, 560 So.2d 1166 (Fla. 1990).
The facts in this record show a reasonable basis on which the jury could have concluded that life imprisonment was the appropriate sentence. For example, Wright had a significant history of alcohol abuse, which this Court has recognized as a mitigating factor supporting a jury's life recommendation. See, e.g., Stevens v. State, 552 So.2d 1082, 1086 (Fla. 1989); Pentecost v. State, 545 So.2d 861, 863 (Fla. 1989); see also Amazon v. State, 487 So.2d 8, 13 (Fla.) (history of drug abuse), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986); Norris v. State, 429 So.2d 688, 690 (Fla. 1983) (same). Wright had been drinking heavily just prior to the murder, and a psychiatrist testified that Wright was under the influence of extreme mental and emotional disturbance and the influence of alcohol and drugs when he killed Ashe. These facts are mitigating and thus can support a life sentence. See, e.g., Carter; cf., e.g., Nibert v. State, 574 So.2d 1059 (Fla. 1990) (substantial alcohol abuse just prior to murder can mitigate punishment). This Court repeatedly has recognized that inflamed passions and intense emotions of an ongoing domestic dispute such as the one in this case are mitigating in nature and may render the death sentence disproportional punishment. See, e.g., Blakely v. State, 561 So.2d 560 (Fla. 1990). It is certainly reasonable for the jury to have reached the same conclusion on the facts in this record. Also, Wright was remorseful. See, e.g., Cochran v. State, 547 So.2d 928 (Fla. 1989). Thus, we find that the trial court erred in overriding the jury's life recommendation.[10]
We now must determine whether the jury's reasonable recommendation in favor of life imprisonment binds the trial court in the event Wright is retried for Ashe's murder. We conclude as a matter of Florida law that Wright may not again be subjected to the death penalty for this crime.
*1032 Double jeopardy principles apply to the penalty phase of capital punishment trials in Florida under section 921.141 of the Florida Statutes (1985), because the Florida procedure is comparable to a trial for double jeopardy purposes. See Brown v. State, 521 So.2d 110 (Fla.), cert. denied, 488 U.S. 912, 109 S.Ct. 270, 102 L.Ed.2d 258 (1988); accord Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984); Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). Florida law also protects individuals facing the death penalty from being twice placed in jeopardy. Art. I, § 9, Fla. Const. Although federal law provides some guidance for interpreting the meaning of Florida's double jeopardy clause, we rely here on article I, section 9 of the Florida Constitution, which "has historically focused upon the protection of the rights of the individual," Booth v. State, 436 So.2d 36, 39 (Fla. 1983) (McDonald, J., dissenting), and thus provides at the very least the same protection of individual rights as the federal constitution.
In the context of capital proceedings, the constitutional protection against double jeopardy provides that if a defendant has been in effect "acquitted" of the death sentence, the defendant may not again be subjected to the death penalty for that offense if retried or resentenced for any reason. See Poland v. Arizona, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986); Rumsey; Bullington. For example, in Bullington the jury voted to convict the accused of murder but it rejected the death penalty in favor of life imprisonment. The jury's judgment, however, was later vacated because the Missouri trial court had violated Bullington's constitutional right to a jury drawn from a fair cross section of the community. Before Bullington could stand trial again, the United States Supreme Court ruled that Missouri could not subject the accused to the death penalty on retrial because the jury's vote as to the penalty in effect acquitted Bullington of the death penalty. The Court reasoned that "[h]aving received `one fair opportunity to offer whatever proof it could assemble,' Burks v. United States, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978)], the State is not entitled to another." Bullington, 451 U.S. at 446; accord Odom v. State, 483 So.2d 343 (Miss. 1986) (an accused is not subject to death penalty in retrial for murder after jury declined to vote for death in first trial).
Similarly, in Rumsey, the trial court sentenced Rumsey to life imprisonment after finding that the state failed to prove any of the aggravating circumstances required under Arizona law to justify the death penalty. The Arizona Supreme Court reversed and remanded for a new sentencing, after which the trial court imposed the death sentence. The United States Supreme Court reversed, holding that Rumsey had been "acquitted" of the death sentence and therefore could not be resentenced to death. Accord Brown, 521 So.2d at 110 (defendant could not be resentenced to death after getting life sentence even though life sentence was based on trial court's erroneous interpretation of law).
Under well-settled Florida law, we have held that life imprisonment is the only proper and lawful sentence in a death case when the jury reasonably chooses not to recommend a death sentence. Tedder v. State, 322 So.2d 908 (Fla. 1975). Thus, when it is determined on appeal that the trial court should have accepted a jury's recommendation of life imprisonment pursuant to Tedder, the defendant must be deemed acquitted of the death penalty for double jeopardy purposes. Art. I, § 9, Fla. Const.
To rule otherwise would force death-sentenced prisoners to risk giving up the life recommendation by arguing for a new trial, and would place capital appellants in the anomalous position of having to choose between arguing guilt phase or penalty phase issues on appeal, even if they reasonably believe that the trial court committed reversible errors in each phase. Putting capital appellants in the position of having to make this "Hobson's choice" would be fundamentally unfair and inconsistent with the Florida Constitution. Art. I, §§ 9, 17, Fla. Const.
*1033 For the foregoing reasons, we reverse the convictions and sentences in this case and remand for proceedings consistent with this opinion.
It is so ordered.
SHAW, C.J., and McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
OVERTON, J., concurs in result only with conviction and concurs with sentence.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] There is a factual dispute as to whether Wright had any legal right to enter or remain in the residence at the time of the murder.
[3] See § 921.141(5)(h), Fla. Stat. (1985).
[4] See id. § 921.141(5)(i).
[5] See id. § 921.141(5)(d).
[6] See id. § 921.141(5)(b).
[7] Wright also argues that other jurors should not have been peremptorily challenged. Although there may be merit in Wright's argument as to the other peremptory challenges in this case, we need not address those challenges because the improper challenge of venire member Salter is dispositive.
[8] We decline to address any other issues Wright raises on appeal, without prejudicing his right to raise those claims if they arise in the event of retrial.
[9] Because we reverse all the convictions in this case on other grounds, we need not address whether the error here constituted fundamental error on the facts presented in this record.
[10] We also conclude that the trial court erred in finding beyond a reasonable doubt that the murder was both heinous, atrocious, or cruel; and cold, calculated, and premeditated. However, there is no need to elaborate here since we reverse on other grounds.