617 So.2d 782 (1993)
James I. LARK, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 91-1641.
District Court of Appeal of Florida, First District.
April 28, 1993.
Rehearing Denied June 4, 1993.
*783 James B. Fensom and Michael J. Hauversburk of Barron, Redding, Hughes, Fite, Bassett & Fensom, Panama City, and Henry M. Coxe, III of Coxe & Mitchell, Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen., Amelia L. Beisner, Asst. Atty. Gen., for appellee.
KAHN, Judge.
James I. "Skipper" Lark, Jr. appeals his convictions and sentences for first degree murder of Carole Lark and second degree murder of Wesley Butler. The state obtained two indictments charging murder in the first degree, and at trial sought the death penalty on each charge. As to the charge of killing Mr. Butler, the jury convicted Lark of second degree murder. On the Carole Lark charge the jury recommended mercy, and the trial judge imposed a life sentence. We reverse and remand for a new trial because the trial court allowed the prosecuting attorney to improperly comment to the jury that Lark invoked his constitutional rights to silence and counsel, and also because the trial court erred in excluding a response made by Lark when informed by a deputy sheriff of the charges against him (points three and four on appeal).
In Lark's first point he contends that the trial court should have dismissed the charges against him because the state deliberately obstructed his attorneys from adequately preparing and presenting an effective state of mind defense to the original first degree murder charges. Many of the factors upon which Lark bases this point are touched upon in our discussion under sections I and II, infra. It should be apparent that law enforcement authorities may not with impunity deliberately block the timely and reasonable efforts of defense counsel to gather probative evidence essential to the preparation of a defense. We need not, however, reach the question of whether such a violation occurred in the present case, since we have determined that on the facts before us dismissal of the charges would not, in any event, have been an appropriate remedy.
In his second point Lark relies upon our decision in Reed v. State, 496 So.2d 213 (Fla. 1st DCA 1986), rev. denied, 504 So.2d 768 (Fla. 1987), to argue that the conviction must be reversed because the state pursued *784 the death penalty in bad faith. In the present case, the state initiated the prosecution against Lark as a death penalty case. After nine months of discovery, Lark's attorneys, and the assistant state attorney assigned to the case, Mr. Harper, entered into a preliminary agreement whereby the state would not seek the death penalty in exchange for Lark's agreement to be tried before a six member jury. When the State Attorney, Mr. Appleman, became aware of the agreement, he fired Mr. Harper, personally assumed control of the case and publicly announced he would seek the death penalty without regard to the preliminary agreement. Consequently, Lark filed a motion to compel enforcement of the agreement reached with Mr. Harper and a motion to dismiss on the ground that the state was seeking the death penalty in bad faith. The trial court denied both motions.
As indicated by this court in Reed, the state will not be allowed to death-qualify a jury in a case in which it appears that the death penalty may not be imposed as a matter of law. Although the state continued to pursue two charges of first degree murder against Lark, and to seek the death penalty on each, the jury returned a verdict of second degree murder as to one charge, and the trial court declined to impose the death penalty as to the remaining charge. Accordingly, Lark may not again be subjected to the death penalty, Wright v. State, 586 So.2d 1024 (Fla. 1991), nor may he be retried on a charge of first degree murder as to the count on which the jury convicted him of second degree murder. H.L.A. v. State, 395 So.2d 250 (Fla. 1st DCA 1981). Since there exists, therefore, no possibility that Lark will ever be tried before a death-qualified jury on these charges, we do not reach this point on appeal.
Lark's fifth point raises the sufficiency of the evidence of premeditation. We find that the evidence viewed in a light most favorable to the state was sufficient to present a question for the jury. See Tibbs v. State, 397 So.2d 1120, 1125 (Fla. 1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ("No appellate court should reverse a conviction or judgment on the ground that the weight of the evidence is tenuous or insubstantial"). See also Aguilera v. State, 606 So.2d 1194 (Fla. 1st DCA 1992).

I
On the afternoon of August 29, 1989, Lark, an alcoholic, visited his stepmother, Carole Lark, at her home in Panama City. This home was the family residence of Lark's deceased father. Upon Lark's arrival, Carole was not at home, but another friend, Wesley Butler, was on a riding mower in the driveway. Shortly afterwards, Carole arrived and the three visited. Carole soon made a phone call to Margaret Bailey, Lark's girlfriend, for the purpose of explaining to Bailey that Lark was too drunk to drive and would require assistance in getting home. Ms. Bailey drove immediately to the Lark home.
A conversation then ensued between Skipper Lark, Carole Lark, Margaret Bailey and Wesley Butler. Primarily the four talked about their recollections of years past when Lark's deceased father developed the Miracle Strip Amusement Park and Shipwreck Island Water Park at Panama City Beach.
Around 4:15 in the afternoon, Lark excused himself to go to the bathroom. He returned a few minutes later carrying a pistol. At first Margaret Bailey thought the gun was one from Lark's father's collection, and that Lark wanted to talk about it. Instead, Lark began firing off rapid shots from the pistol. The shots struck Carole Lark, who fell to the floor, and Wesley Butler, who ran outside and collapsed in the driveway. Bailey, alarmed and frightened for her own safety, ran from the house, caught a ride to a nearby resort, and informed a security person of the events.
In approximately half an hour, emergency medical personnel, as well as deputies from the Bay County Sheriff's Department, arrived at the home. The deputies took Lark into custody and recovered the pistol from Harris, an EMT. Carole Lark was *785 dead at the scene, and Wesley Butler died from his wounds later that evening at a local hospital.
At the Bay County Jail, sheriff's investigators Dufresne and Nolin took Lark to an office and began a taped interview. Lark's private attorneys, including Mr. Robert Hughes, arrived at the jail within minutes after the interview began and Hughes met with Lark. After meeting with Lark, attorney Hughes asked that the questioning be stopped. Hughes further requested that Lark be taken to a local hospital in order to have blood drawn for a blood alcohol test. Hughes made this request at approximately 6:30 p.m. In addition to the blood test, Hughes also desired to have his client seen immediately by a psychologist, psychiatrist, or other physician. Sheriff's personnel denied the request, but eventually agreed to take Lark to the hospital to have blood drawn after Lark signed a document in which he consented to the procedure. At 9:05 p.m. a blood sample was drawn at Bay Medical Center, which upon analysis revealed a .23 percent blood alcohol level as of that time. The next day Lark was admitted to the hospital with symptoms of alcohol withdrawal.
Dr. William A. Sybers, Bay County Medical Examiner, performed autopsies of Carole Lark and Wesley Butler. The doctor determined that Mrs. Lark was shot three times and died from a bullet wound to the heart. Butler was shot twice and died from loss of blood.
When informed that he was being charged with first degree murder in the deaths of both Mrs. Lark and Mr. Butler, Lark responded, "Who shot Wes Butler?" In the course of his defense, Lark presented no evidence that he did not shoot and kill both victims. His defense centered upon voluntary intoxication and, according to his view, lack of the degree of premeditation necessary to support a conviction for first degree murder. The prosecution adduced no evidence of motive.
At trial Lark introduced evidence that his whole blood alcohol level was .23 percent at 9:05 p.m. on the night of the shooting. Experts in the case testified that at the time of the shooting some four hours earlier, Lark's blood alcohol level would have been between .35 percent and .40 percent. Dr. Susan Danahy, a clinical psychologist and program director at the Friary, a recovery facility in Gulf Breeze, testified that at such a level one is not able to function mentally and reflect upon what he is doing even though he may be able to function physically. As a result of the turn of events after Lark's arrest, the only direct evidence of the degree of intoxication was that derived from the blood sample drawn after 9:00 p.m.

II
During the trial, attorney Hughes took the stand as a witness for the defense. Hughes testified that at 6:30 p.m. he requested Investigator Dufresne to allow Lark to have a blood test and a medical examination. Hughes explained to Investigators Dufresne and Nolin the purpose of having the blood drawn, which was to preserve it for evidentiary purposes and to insure that the proper procedures were followed so the blood test results would ultimately be admissible. Hughes was certain his client could have his blood drawn at the Bay Medical Center by a person legally qualified to do the procedure. Sheriff's personnel declined the request to go to Bay Medical Center and suggested that a nurse from the jail would be available to draw the blood. After considering the matter for about half an hour, Hughes, who was at first reluctant to have the nurse draw the blood because of uncertainty about qualifications, told Dufresne to go ahead and have the nurse take a blood sample. At that point, Investigator Nolin told Hughes that the jail nurse would not be available to draw the blood. Hughes was confronted with a situation in which police officers, having custody of his client, would not permit blood to be drawn at a nearby hospital, nor would they permit a nurse at the jail to draw the blood.
During the next hour, an assistant state attorney, Mr. Paulk, arrived at the jail. Paulk required Lark to consent in writing to having blood drawn, and Lark did so at *786 about 8:30 p.m. After that, sheriff's personnel took Lark to Bay Medical Center where he arrived sometime after 9:00 p.m.
Once at the hospital, Hughes found out that the Bay County deputies who had brought Lark over did not have the proper equipment required to preserve the blood. When a hospital technician asked if the deputies had a "legal kit," one deputy responded that he did not, and that he would have to go to the Panama City Police Department to obtain one.
Lark now argues that he sought to elicit the foregoing evidence in order to show that evidence of his state of mind was available close to the time of the shooting and arrest, but that it was now lacking due to the state's denial of Mr. Hughes' requests. Lark wanted the jury to consider the lack of evidence in determining an appropriate verdict on the charges of first degree murder.
Before Hughes took the stand, the State Attorney, Mr. Appleman, told the court that questioning Hughes concerning the delay in drawing blood would open the door for the state to bring out Lark's invocation of his Fifth and Sixth Amendment rights. The state attorney argued that such would be proper because he believed that Lark's invocation of his constitutional rights prevented the state from thereafter acceding to Lark's request that his blood be drawn:
MR. COXE [defense counsel]: The question was what did Mr. Hughes request.
THE COURT: Right.
MR. APPLEMAN: I'll tell you what, Judge, when he asks it, I'm coming right back on the constitutional standards. He invoked his constitutional rights and they couldn't get anything ...
* * * * * *
MR. APPLEMAN: Your Honor, essentially what he is trying to do is to take and talk about the blood samples with Mr. Hughes. He wants his cake and he wants to eat it, too. The whole thing stems down to this. You heard the testimony before in the prior hearing concerning this very issue. Mr. Hughes on behalf of the defendant invoked his certain constitutional rights. And therefore, this officer couldn't talk to the defendant anymore, and if he wanted samples from him, he was going to have to go to a Court and get a court order to do it. And now what they want to do is say hey, Mr. Hughes demanded this stuff, darn well knowing that I'm going to be restricted in any evidence that I present if you so rule about the fact that Mr. Hughes invoked the man's constitutional rights, and that's the issue you have confronting you. Do you let them have their cake and eat it, too?
Because my position is when they start going in to Mr. Hughes and talking about it, they just open the whole cotton picking door, and I am going to go through it from one step to the end, all the way through Alton Paulk and conversations with Mr. Hughes to the fact that the defendant invoked his constitutional rights at the very beginning and that they couldn't get a blood sample, that the hampering of that blood sample wasn't due to the law enforcement agency.

(emphasis added).
After hearing argument, the court eventually ruled that if Mr. Hughes testified, the state would be "entitled to come back and show by testimony what took place." This ruling set the stage for what transpired in cross-examination of Hughes by the State Attorney:
Q. [By Mr. Appleman]: Mr. Hughes, at what time did you arrive at the sheriff's office?
A. [Robert Hughes]: It was about 6:00 o'clock.
Q. For how long did you talk with the defendant after J.D. Nolin let you go into the room?
A. About 15 or 20 minutes.
Q. So somewhere around 6:00 o'clock you arrived and you went into the room a few minutes after 6:00, by 6:30, a quarter until 7:00 you had completed your conversations with the defendant?
A. I would say by 6:30.

*787 Q. 6:30. Which judges did you contact at 6:30 to get a court order to get this blood sample?
A. We didn't contact any judges.
Q. Which judges did you contact at a quarter till to get this blood sample?
A. To be very frank with you, Mr. Appleman 
Q. No, answer the question I asked you.
A. We did not contact 
Q. Which judges did you contact?
A. We did not contact any judges nor did we attempt to contact any judges because it did not  it was inconceivable that anyone would refuse the request that we were making to have the blood drawn, so it didn't  it was not anything that was on the list that anybody would think of that you would need to do.
Q. What is the legal obligation of the Bay County Sheriff's Office to give you a blood sample on an individual after you have walked into a room and told those officers that man does not want to talk to you, he invokes his constitutional rights under the Constitution of the United States?

A. That really isn't what I said, Mr. Appleman.
Q. What is the legal authority after you have invoked his constitutional rights to require them to do it? You have told him you don't want him to talk to him anymore, haven't you?

THE COURT: Mr. Appleman, go ahead and let him answer the question.
THE WITNESS: I told Mr. Nolin that we would  I would like to talk to Mr. Lark for a while. Now, I then advised I think Mr. Nolin that Mr. Lark did not desire to carry on with his interview with him. At that point my responsibility as counsel for Mr. Lark was to begin to do the things that were necessary to prepare his defense, and the most immediate thing that came to mind was to have blood drawn so that we could preserve the blood alcohol level of this man at a time so that we wouldn't be here a couple of years later trying to decide whether he was too intoxicated or he was intoxicated or not. And so most of the time my experience has been  and I have been to the jails before back when I was in criminal 
MR. APPLEMAN: Your Honor, this is not even responsive to the questions asked. This isn't a narrative response. There was a question asked, and he is not responding to it. I ask that it be stricken.
THE COURT: I think you're getting a little beyond in terms of this last part of your response.
(emphasis added).
Lark now argues that the court erroneously allowed the State Attorney to improperly comment on Lark's invocation of his constitutional rights. Adding emphasis to his argument, Lark points out that although State Attorney Appleman twice asked Mr. Hughes about the legal obligation of the sheriff's department after a defendant invokes "his constitutional rights under the constitution of the United States," Mr. Appleman, although objecting to the nonresponsiveness of Hughes' answer, never sought to elicit an answer to the questions. Our independent review of the transcript does not belie this observation.
On appeal, the state has apparently realized that the defendant's invocation of his right to counsel would not, in and of itself, prevent the very same defendant from successfully requesting law enforcement officers to allow him to have a blood sample taken. Indeed, it has long been held that even the taking of a nonconsensual and warrantless blood sample for alcohol testing does not violate a defendant's right against self incrimination. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The state now argues that the questions asked by Mr. Appleman were not specific to Lark's case, but rather "dealt only with the obligations on law enforcement in any case where a defendant invokes his or her rights" (emphasis in original). Accordingly, goes the argument, since the prosecutor did not comment on Lark's right to remain silent, the argument on appeal must fail.
*788 The state next argues that, in any event, the questions were entirely proper in order to show the absence of bad faith on the part of the Bay County officers. This particular argument maintains that the deputies had a "good faith" reason for denying Lark's demands because of their erroneous belief that the state could not compel a blood test after the defendant's invocation of his constitutional rights. Finally, argues the state, it was Lark's attorney who opened the door to the prosecutor's questions, by the testimony elicited from Mr. Hughes. Since the trial court had previously ruled he would allow the state to introduce evidence of Lark's invocation of his constitutional rights, Lark's lawyer should now be held accountable for his decision to question Hughes about the events at the jail. In making this argument, the state speaks of "invited error," citing Pope v. State, 441 So.2d 1073 (Fla. 1983), and thereby accuses the defense of constructing the examination of Hughes so as to create built-in error and a trap for the prosecution.
We categorically reject the state's arguments on this issue. The prosecutor's questions were not merely susceptible of being interpreted as referring to the defendant's invocation of his rights, State v. Marshall, 476 So.2d 150 (Fla. 1985); but rather, such questions directly and repeatedly suggested to the jury that Lark had invoked his rights, and somehow his invocation of these rights had thwarted his own attempt to collect evidence and prepare for trial. "[A] defendant cannot be penalized for exercising his fifth amendment privilege." State v. Burwick, 442 So.2d 944, 947 (Fla. 1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). A strict prohibition exists because evidence of a defendant's invocation of rights "creates an inference that the defendant is guilty of committing the criminal act." Id. In this case, the error was particularly harmful because a primary issue before the jury involved the degree of Lark's criminality. The "guilty knowledge" type of inference that could be created by invocation of one's constitutional rights should be particularly discouraged in a case where the defendant's state of mind, or intent, is so central to the inquiry. We hold that the trial court erred by permitting comment on Lark's invocation of his constitutional rights during the cross-examination of Mr. Hughes, and further hold that the attempt by the defense to explain the nonavailability of a contemporaneous blood sample did not open the door to such cross-examination.

III
During examination of Investigator Dufresne, defense counsel asked Dufresne whether Lark made any response when told he was under arrest for the murder of Wes Butler. The prosecutor objected that the answer to the question would be "hearsay, it is a self-serving statement." Defense counsel proffered that Dufresne's response would be that Lark said, "Who shot Wes Butler?" and that the defense was not offering this statement for its truth, but solely as evidence illustrative of Lark's state of mind. The trial court sustained the hearsay objection, expressing the view that the defense had not come up with "an exception to the hearsay." We find error on this point because the proffered statement was not hearsay, and, accordingly, the presence of an exception to the hearsay rule was not relevant.
Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Section 90.801(1)(c), Fla. Stat. (1989). A statement is "an oral or written assertion." Section 90.801(1)(a)1, Fla. Stat. (1989). "If an out-of-court statement is offered in court to prove the truth of the facts contained in the statement, it is hearsay. If an out-of-court statement is not offered to prove the facts contained in the statement, it is not hearsay." Ehrhardt, Florida Evidence, § 801.2 (1992 ed.) (footnotes omitted). Even though a particular statement might not be admissible to demonstrate its truth or falsity, this does not compel a conclusion that the same statement is not admissible to show the declarant's state of mind. See Hunt v. *789 Seaboard Coastline R.R. Co., 327 So.2d 193 (Fla. 1976).
We find that Lark's query was not an oral assertion. See United States v. Lewis, 902 F.2d 1176, 1179 (5th Cir.1990) (while "assertion" is not defined in the Federal Rules of Evidence, the term has the connotation of a positive declaration). Indeed, the state has never identified what "truth" was attempted to be proven by Lark's question. In its brief, the state argues that we should affirm the trial court's decision to exclude Lark's response "because that statement was irrelevant to any material issue at trial." We note, however, that the prosecutor never argued relevance below, and it is apparent from our reading of the record that the trial court never considered this issue. Accordingly, we decline to consider this belated argument. We further decline the state's invitation to find that any error in refusing to admit the matter was harmless. We again note, as we did on the previous point, that Lark's state of mind was the central issue in this case. We are unable to say that the state has carried its burden of proving beyond a reasonable doubt that the error was harmless. State v. Diguilio, 491 So.2d 1129 (Fla. 1986). See also Wise v. State, 580 So.2d 329 (Fla. 1st DCA 1991).
REVERSED and REMANDED for a new trial.
ZEHMER and MICKLE, JJ., concur.