968 So.2d 99 (2007)
Coleman Fred SULE, Appellant,
v.
STATE of Florida, Appellee.
No. 4D06-2194.
District Court of Appeal of Florida, Fourth District.
November 21, 2007.
*100 Carey Haughwout, Public Defender, and Anthony Calvello, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Laura Fisher Zibura, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
Appealing his multiple convictions arising from the murder of his ex-girlfriend as well as solicitation to murder her neighbor whom he attempted to frame for the murder, appellant makes multiple claims of trial court error. We affirm as to all issues and address two in detail. In the first, we hold that the trial court did not err in denying a motion to sever the murder charges from charges of solicitation to murder. As to the second, we hold that the trial court did not abuse its discretion in excluding a defense witness, because the witness sought to invoke his Fifth Amendment privilege on material issues.
Appellant Coleman Fred Sule and the victim Doreen Domato dated for approximately two-and-a-half years.[1] During that time they lived together in Domato's house for approximately six months. Domato eventually ended the relationship.
On August 19, 2003, Domato received flowers at work from Sule. When she read the note that came with the flowers, she became pale, jittery, upset, and teary. She refused the flowers and told the delivery person never to bring her anything from that gentleman. Later that day, she asked a co-worker how to get a restraining order as she had ended her relationship with Sule. She left work around 5:30 p.m.
Around 4:30 p.m. two teenagers in the house next door to Domato saw a man wearing a blue t-shirt and jeans emerging from the bushes whom they identified as Sule, as they had seen him at Domato's before. He rapidly walked towards Domato's carport. They thought he was acting suspiciously. About two hours later, they heard a noise and observed him leaving from Domato's house and running towards the woods. They went outside to check out what was going on.
While they were outside, Domato's next door neighbor Xavier Heredia saw them on the road. He asked what was going on, and the teenagers told him that they had *101 seen a man running towards the woods. While they were talking, a gray Mitsubishi Lancer came around the corner. Sule was driving the car, and he was now wearing a white t-shirt. He looked frightened. Heredia recognized Sule, because he had seen him many times and knew that at one point he lived with Domato.
Later that evening when Sule picked up his current girlfriend, he was wearing a white shirt and driving a Lancer rental car.
On August 20, 2003, the day after the neighbors observed Sule at Domato's home, Domato's best friend became concerned when Domato did not answer her phone. She called the police, because she was worried as Domato had recently ended her relationship with Sule. An officer came, and he observed a body in the back of the house. Entering the home, he found Domato's badly burned body with a dog leash around her neck. All of the doors and windows in the house were locked. Upon interrogating the neighbors they found out about Sule's presence at the house the day before.
The police brought Sule in for an interview that day. He told them he had rented a Mitsubishi vehicle the day before the murder, because his own vehicle was in the shop. On the day of the murder, he spent the afternoon with his business partner. When the officers told him that witnesses had identified him at the house, he became irate and insisted they were either mistaken or lying.
When the police called the business partner, he told them that Sule was with him doing paperwork between 5:00 and 7:30 p.m. on the day of the murder. However, when the police showed up at his house and told him they were investigating a murder, the business partner told them that Sule was not with him on that day. The partner told them that Sule had called and asked him to tell anyone who called that they were together on that date and time.
The medical examiner determined that Domato had died of asphyxiation and her body was burned after she was dead. The fire investigator determined that an accelerant, such as gasoline or lighter fluid, was used to start the fire. Later, an accelerant K-9 alerted to some areas of the scene, Sule's rental vehicle, and to Sule's shoes.
Sule was arrested on August 28th and taken to jail. He was charged by indictment with first-degree murder, arson of a dwelling, and burglary of a dwelling with an assault or battery. The state also gave notice that it would seek the death penalty.
While Sule was awaiting trial at the St. Lucie County Jail, he approached two other inmates, Robert Becraft and Michael Bittle, and asked them to help him mastermind a plan to set up Domato's neighbor, Heredia, as the perpetrator of the murder. Both Becraft and Bittle testified at trial without any promises of leniency for their testimony.
Sule made a detailed statement to Bittle about how he entered Domato's home through the attic. When she came home, he confronted her about rejecting his flowers. She tried to run, but he caught her, and they fought. He slammed her head into the ground, rendering her unconscious. He then choked her to death with the dog leash. To cover up his crime, he dragged her body into the bedroom and poured gasoline on it. He set it afire in the hopes that it would destroy any DNA evidence. Because he had put a towel under the door, the fire went out. When Sule left the house, he changed his clothes, walked back to his car, and drove back around the block. He saw some neighbors out in the yard, and they looked right at him.
*102 To establish an alibi, he drove as fast as he could to Jupiter to make a call on his cell phone so that there would be a record of him being in Jupiter at a certain time. He went to his girlfriend's house and picked her up. They stopped by Wal-Mart on the way back to his house, and he picked up some cleaning supplies so he could clean out the car. When Sule got a phone call from his daughter informing him that Domato was dead, he had to act like he was upset.
Sule asked Bittle and Becraft for their help in setting up Domato's neighbor, Heredia, to make it look like Heredia killed Domato. If Becraft was found not guilty in his upcoming trial, Becraft would make it look like Heredia broke into Domato's house for money and that he killed her when she came home and caught him. Becraft and someone else would hang out with Heredia and then go to law enforcement and tell them that they were out drinking and drugging with Heredia the night before, and that Heredia admitted to killing Domato. Becraft would plant a telephone, jewelry, and a .22 caliber pistol in Heredia's house. Heredia would be killed, and they would make it look like Heredia committed suicide or overdosed.
Becraft was convicted, so the plan changed. Becraft's brother Marvin would take Becraft's place in the befriending and then framing of Heredia. In exchange, Marvin would get a large sum of money, and Becraft would get an attorney to represent him on appeal.
Sule wrote his plans to Becraft in notes, using Bittle as a go-between to pass the notes. At some point, Bittle went to Detective Burkhardt and told him that he had information about Sule possibly killing another person and told him he was passing notes. Burkhardt asked Bittle to copy the notes, pass the copies on, and give the originals to Burkhardt, which he did. Originals and copies of the notes were introduced into evidence and read in open court. The notes included diagrams, phone numbers, and directions. One of the notes detailed Heredia's "confession." Bittle eventually wore a wire to record conversations with Sule.
As part of the plan, Sule's son, Christopher, would meet with Marvin and Bittle's friend "Bryon" and give them a phone from Domato's house and $200. Sule communicated the plan to Christopher by holding a letter up to the glass when Christopher visited with him in jail. After the visitation, Becraft saw Sule walking back, and Sule smiled at him, waved, and gave the thumbs up. A minute or two later, officers ran up behind Sule, and he came out in handcuffs with the officers. The officers retrieved the letter from Sule.
Christopher left the jail, and helicopter surveillance followed him to an ATM machine and eventually to the Flying J truck stop, where he was to meet with Marvin and "Bryon," who was actually an undercover detective. When they met, Christopher gave the undercover detective a phone and $200 cash in a plastic bag. At that point, he was arrested.
The state charged Sule by information with solicitation to commit first-degree murder of Heredia, solicitation to tamper with and/or fabricate evidence, and solicitation to commit burglary of a dwelling. Pursuant to Rule of Criminal Procedure 3.151(a) the state moved to consolidate the cases for trial on the grounds that the cases were related and based on the same acts or transactions. The trial court granted the motion to consolidate.
Subsequently, Sule moved to sever the offenses pursuant to rule 3.152(a)(2)(A), noting that the motion had been granted during a period when he was unrepresented by counsel. He claimed that a severance *103 was appropriate to promote a fair determination of his guilt or innocence. The state objected, and the trial court denied severance.
Prior to trial, Sule moved to exclude statements by Domato regarding her fear of Sule. He claimed they were inadmissible hearsay. The trial court denied the motion.
Sule also sought to have his son Christopher testify at trial. However, when the state asked Christopher questions during his deposition, he invoked his Fifth Amendment right against self-incrimination. The trial court ultimately ruled that the defense was seeking to use Christopher's testimony to establish an inference that someone else, namely Christopher, killed Domato. Because the state had a right to cross-examine Christopher on the entire event and theoryhow Christopher got into the house, what he did there, and how he got outthe testimony involved a material issue in the case. Christopher would lose his Fifth Amendment privilege if he took the stand. Christopher elected not to testify.
The case proceeded through a lengthy trial. The jury found Sule guilty of first-degree murder, with a special finding of both premeditated and felony murder; arson; burglary of a dwelling with an assault or battery; solicitation to commit first-degree murder; solicitation to tamper with and/or fabricate evidence; and solicitation to commit burglary of a dwelling. The jury recommended against imposing the death penalty.
Sule was sentenced to life without parole for the first-degree murder, thirty years for arson, life for burglary with a battery, thirty years for solicitation to commit murder, five years for solicitation to tamper with evidence, and five years for solicitation to commit burglary, with all sentences to be served consecutively. He appeals.
I. Denial of Motion to Sever
Prior to trial, Sule moved to sever the first-degree murder, arson, and burglary charges from the solicitation to commit murder and burglary charges as well as the tampering with evidence charges. Whether a trial court errs in granting appellant's motion to sever is reviewed for an abuse of discretion. See Fotopoulos v. State, 608 So.2d 784, 790 (Fla.1992) ("granting a severance is largely a matter within the trial court's discretion"); Dupree v. State, 705 So.2d 90, 95 (Fla. 4th DCA 1998). Sule claims that the court abused its discretion, while the state disagrees, because there was a causal link between all the crimes charged. We agree with the state.
Florida Rule of Criminal Procedure 3.151(b) provides: "Two or more indictments or informations charging related offenses shall be consolidated for trial on a timely motion. . . ." Offenses are related "if they are triable in the same court and are based on the same act or transaction or on 2 or more connected acts or transactions." Fla. R.Crim. P. 3.151(a). However, rule 3.152(a)(2) provides:
In case 2 or more charges of related offenses are joined in a single indictment or information, the court nevertheless shall grant a severance of charges on motion of the state or of a defendant:
(A) before trial on a showing that the severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense. . . .
The supreme court has explained:
"[T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." *104 Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence.
Wright v. State, 586 So.2d 1024, 1029-30 (Fla.1991) (alteration in original) (citations omitted). Before permitting charges of separate crimes to be tried together, the court must be careful that there is a meaningful relationship between the charges. Crossley v. State, 596 So.2d 447, 450 (Fla. 1992). The danger of improper consolidation lies in the fact that evidence relating to one crime may have the effect of bolstering the proof of the other. Id.
In Fotopoulos v. State, 608 So.2d 784 (Fla.1992), the supreme court approved the consolidation of two murder charges, one of which arose from the solicitation of the other, similar to the facts of this case. Fotopoulos threatened a woman into shooting and killing Ramsey while he videotaped her. He then used the videotape to blackmail her into hiring someone to murder Fotopoulos's wife. The hired hit man entered the Fotopoulos home and fired a non-fatal shot to the wife's head. Fotopoulos then shot and killed the hit man to make it appear that the hit man was killed during a burglary. Fotopoulos was eventually charged and found guilty of two counts of first-degree murder, two counts of attempted first-degree murder, two counts of solicitation to commit first-degree murder, one count of conspiracy to commit first-degree murder, and one count of burglary of a dwelling while armed.
Prior to trial, Fotopoulos filed a motion for severance of offenses, alleging that there was no connection between the Ramsey murder and the other offenses. In denying the motion for severance, the trial court found that the offenses were connected in an episodic and temporal sense. Further, shortly after the Ramsey killing, the plots to kill Fotopoulos's wife were set in motion and were "well connected."
The supreme court found no abuse of discretion in the trial court's denial of severance:
[S]everance was not required under rule 3.152(a)(1) because the offenses were clearly connected in an episodic sense. Moreover, on this record, there was no showing that severance of the properly joined offenses was necessary to promote a fair determination of Fotopoulos' guilt or innocence. Even if there had been separate trials, evidence of each offense would have been admissible at the trial of the other to show common scheme and motive, as well as the entire context out of which the criminal action occurred.
Id. at 790 (citations omitted).
Similarly, the murder of Domato and solicitation to murder Heredia and the related charges were connected in the episodic sense. The murder of Domato resulted in the plot to burglarize and kill Heredia. Evidence of the Domato murder would be admissible in the trial of the solicitation. Likewise, evidence of the solicitation to murder Heredia and pin the blame for the Domato murder on him would be admissible in the Domato murder trial. See, e.g., Heath v. State, 648 So.2d 660, 664 (Fla.1994) ("Evidence that a suspected person in any manner endeavors to evade a threatened prosecution by any ex post facto indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions."); Jenkins v. State, 697 So.2d 228, 229 (Fla. 4th DCA 1997) ("a defendant's direct threat against *105 a witness is relevant and may be admitted into evidence because it could be indicative of the defendant's guilt of the underlying offense"). The trial court did not err in denying the motion for severance.
II. Exclusion of Witness Who Exercised Fifth Amendment Privilege
Sule argues that the trial court abused its discretion and violated his constitutional rights when it excluded the trial testimony of his son, Christopher, because Christopher invoked his Fifth Amendment privilege against self-incrimination. Apfel v. State, 429 So.2d 85 (Fla. 5th DCA 1983); Combs v. Commonwealth, 74 S.W.3d 738 (Ky.2002). The state counters that since Christopher refused to waive his Fifth Amendment privilege, the court correctly ruled that he would not be permitted to testify at trial. Because Christopher's testimony was materially related to the offense, the trial court did not abuse its discretion in refusing to allow him to assert his Fifth Amendment privilege if he testified.
Prior to trial, Christopher refused to answer questions during deposition. When the trial judge became aware of the issue, he appointed counsel for Christopher and conducted a hearing at which Christopher testified. During the hearing, Christopher testified that he went to Domato's house on August 19th after work to steal something to support his crack habit. He came in through the backyard and went into the house through the attic access in the carport. While he was in the crawl space, he heard what sounded like a person coming into the house, taking the dog out for a walk, and then returning the dog back to the house. He came down into the bedroom and he saw Domato pull in so he went back up in the attic. When asked if she came into the house, he raised his Fifth Amendment privilege.
At first the court ruled that Christopher could testify up until the point of invocation with the understanding that he could not invoke the privilege before the jury. The state moved for reconsideration. The trial court determined that Christopher's testimony related to a material issue, because Sule wanted to use it to infer that Christopher, not Sule, committed the murder. The court ruled that if Christopher took the stand, he could not assert his Fifth Amendment privilege should the state ask what he did after Domato pulled into driveway. After explaining this, Christopher elected not to testify.
An accused has a right to present his own witnesses to establish a defense. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). The Sixth Amendment guarantees the accused the right "to have compulsory process for obtaining witnesses in his favor. . . ." U.S. Const. amend. VI. However, the right to compulsory process does not transcend the adversarial system:
The defendant's right to present witnesses in his own defense, however, does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination. . . . The fifth amendment provides no immunity from cross-examination for a witness who elects to testify; it is not a "positive invitation to mutilate the truth a party offers to tell." Brown v. United States, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958).
Striking the testimony of a witness is a drastic remedy. It is not to be lightly done. Any action by the court may be inappropriate when a witness invokes *106 the fifth amendment privilege to avoid cross-examination on purely collateral matters. Even when the witness refuses to answer questions relevant to matters at issue, striking only portions of the testimony may be the more reasonable remedy if that can avoid the unfairness created by the avoidance of full cross-examination, but the purpose of cross-examination is to test the credibility of the witness and the truthfulness of his earlier testimony. Striking all of the testimony of the witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of the process. United States v. Lord, 711 F.2d 887, 892 (9th Cir.1983).
Lawson v. Murray, 837 F.2d 653, 655-56 (4th Cir.1988) (emphasis added). Consistent with this understanding, the trial court originally agreed to permit Christopher to testify that he came to the Domato house and hid in the attic. When the court ruled on reconsideration that Christopher could not testify and invoke the Fifth, the court was persuaded by the fact that he would not be testifying to collateral matters but rather would be testifying to material issues.
Sule relies on Combs v. Commonwealth, 74 S.W.3d 738 (Ky.2002), where the Kentucky Supreme Court found that the trial court erred in excluding a defense alibi witness who invoked the Fifth Amendment in response to certain questions. The witness, however, testified to facts collateral to the charges against the defendant.
In Combs, the state prosecuted the defendant on two charges of trafficking in cocaine. The defendant asserted an alibi with respect to the offenses. At the time of one of the incidents, she claimed she was shoplifting. She presented an alibi witness, who first testified on a proffer. The witness stated that she was shopping with the defendant at a K-Mart on the date in question, and the defendant was detained at the store. When asked whether she saw the defendant shoplift any items and her involvement in the matter, the witness took the Fifth. The trial court concluded that if the witness asserted the Fifth Amendment as to any questions, she could not testify at all.
The Kentucky Supreme Court disagreed, explaining that the witness's testimony as to collateral issues to the charge would not require exclusion of all of the witness's testimony and stated:
When cross-examination is precluded only with respect to collateral issues, the Sixth Amendment does not require the court to strike the witness's testimony.
When cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege, however, the trial court, in its discretion, may refuse to permit that witness's testimony. . . .
. . . .
In striking the appropriate balance between a defendant's Sixth Amendment rights and the government's interest in cross-examination, a "trial judge may or even must limit the government's cross-examination on collateral matters if this can be done without unduly limiting the government and if doing so will preserve the defendant's ability to call a material witness who would otherwise claim the privilege.["]
Where . . . a defense witness's claim of privilege shields material testimony from cross-examination, however, this balance weighs against the defendant.
Id. at 744 (emphasis added) (quoting United States v. Gary, 74 F.3d 304, 310 (1st Cir.1996)). The questions for which the witness asserted a Fifth Amendment privilege involved a completely collateral matter *107 the witness's own involvement in a shoplifting incident. The court found that excluding all of the witness's testimony, which undercut the defendant's alibi, was improper.
Combs actually supports the trial court's exclusion of Christopher's testimony in this case. Christopher's testimony involved material issueswho was at Domato's house and who may have killed Domato. Christopher sought to invoke his Fifth Amendment privilege to prevent the state from fully interrogating on these crucial points. It did not involve collateral matters. A court does not abuse its discretion in excluding testimony when cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege.
In an analogous situation to this case, we have held that the trial court did not abuse its discretion in excluding a witness who, through the invocation of the privilege, would imply that someone other than the defendant committed the crime. In Maul v. State, 528 So.2d 1384 (Fla. 4th DCA 1988), the trial court excluded the entire testimony of a defense witness who, during a proffer, invoked the Fifth Amendment privilege as to critical questions involving the hit and run accident with which appellant was charged and convicted. During the proffer, the defense witness testified that he was the owner of the vehicle involved in an accident. On cross-examination, the witness stated that he did not see the defendant drive his car on the date of the accident, but he invoked the Fifth when asked how he knew that the defendant was not involved in an accident on that date and again invoked the Fifth when asked who was in possession of the car. The trial court refused to permit the witness to testify because the witness refused to subject himself to full and fair cross-examination on the issue. This court affirmed, and in a concurring opinion Judge Glickstein explained that no abuse of discretion was shown where the witness's "invocation of the privilege would have raised the inference that he, rather than appellant, was the driver of the vehicle involved in the hit and run accident, such inference being in a form not subject to cross examination." Id. at 1386. The same may be said of Christopher's proposed testimony in this case.
Sule also relies on Apfel v. State, 429 So.2d 85 (Fla. 5th DCA 1983) to support his position. We agree with the trial court that there are insufficient facts in that opinion to apply it to the facts in this case.
Because Christopher's invocation of the privilege shielded material matters from full and fair cross-examination, the trial court did not abuse its discretion in excluding his testimony.
Sule raises three other issues, none of which require reversal. He claims that the trial court erred in allowing a witness to testify to the victim's state of mind regarding her fear of Sule. Even if it was error to admit the testimony, we conclude that it was harmless beyond a reasonable doubt. He also claimed that the trial court erred in permitting the state's peremptory challenge to an African-American juror. We have examined the record and conclude that the state offered a race-neutral reason for the peremptory challenge. See Melbourne v. State, 679 So.2d 759, 764-65 (Fla.1996). Finally, Sule argues that the jurors should not have been instructed on the arson alternative for felony murder, as there was no evidence to support felony murder with arson as a requisite underlying forceful felony in this case. Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Because Sule did not object to the jury instructions during trial, this claim was not preserved for appellate *108 review. Gunsby v. State, 574 So.2d 1085, 1089 (Fla.1991).
For the foregoing reasons we affirm the convictions and sentences.
GUNTHER and GROSS, JJ., concur.
NOTES
[1] Despite the length of the statement of facts in this opinion, it does not contain all of the evidence presented by the state against Sule.